No. 54,718

State of Kansas, *Appellee*, v. Joe Buddy Myers, *Appellant*.

(664 P.2d 834)

Opinion filed June 10, 1983.

*Charles S. Arthur, III*, of Arthur, Green, Arthur & Conderman, of Manhattan, argued the cause and was on the brief for appellant.

*Dennis C. Sauter*, special assistant attorney general, argued the cause and *James E. Flory*, deputy attorney general, and *Robert T. Stephan*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

Miller, J.: Joe Buddy Myers appeals from his conviction by a jury in Riley District Court of aggravated burglary, K.S.A. 21-3716, kidnapping, K.S.A. 21-3420, and felony murder, K.S.A. 21-3401. The case was previously before us on an interlocutory appeal, *State v. Myers*, 229 Kan. 168, 625 P.2d 1111 (1981). The issues now raised all relate to the defense of compulsion, as defined in K.S.A. 21-3209.

The trial transcript is over 1,100 pages in length and the facts are quite detailed. We summarize them here. On September 10, 1979, Cristel Watson and her sister, Elke McGuyton, shared an apartment in Manhattan, Kansas, where Cristel was a student at Kansas State University. Cristel's boyfriend, Eric Sands, who lived in Kansas City, had left a parcel containing fifteen pounds of marijuana in the apartment. Cristel was to deliver it to the defendant, Joe Buddy Myers; Myers was to sell the marijuana and then pay Cristel, who in turn would give the money to Sands. Elke's boyfriend, Kevin Kitchens, the homicide victim, was spending the night with her in the apartment. Both Elke and Kitchens were apparently unaware of the marijuana transaction or of the presence of the contraband in the apartment.

Myers telephoned Cristel and made arrangements to pick up the marijuana. He came to the apartment around 11:00 o'clock

p.m. on September 10, and Cristel took him to her bedroom where she delivered the marijuana to him. Myers did not see Elke or Kitchens; apparently they were in another bedroom, with the door closed. Myers left the apartment, taking the marijuana with him.

Cristel studied, then went to sleep. She awoke around 2:00 o'clock a.m. to find Myers standing at the foot of her bed. Myers gave her some money; she got up and went over to her desk, where she began counting the money. Myers produced a handgun, which he pointed at Cristel's head. He instructed her to telephone Sands and tell him that he (Myers) did not want the marijuana. Cristel complied. Elke, meanwhile, had come out of her bedroom to go to the bathroom, and she discovered a man, later identified as Lorin Axvig, standing in the hallway. Elke darted into the bathroom. About this time, Myers brought Cristel out of her bedroom and she discovered that Axvig was in the apartment. Myers stated that both girls would have to leave the apartment. Cristel went into Elke's bedroom and got some clothing for Elke. Axvig was pointing a handgun at Kitchens, who was stretched out on the bed. Cristel took the clothing to Elke; Elke dressed, and both women came out of the bathroom. Elke went into her bedroom to get her shoes, and Axvig was still in there, pointing a gun at Kitchens. Myers then took both women out of the apartment, holding Elke with his left hand and his gun with the other. Axvig remained in the apartment. During all of this period of time, Axvig said nothing; Myers did all of the talking, and he seemed calm and collected.

Once outside the apartment building, Cristel broke away, screamed, and quickly disappeared from sight. Myers, meanwhile, held onto Elke; he pushed her into his car, shoved her over into the back seat, and then drove slowly around the parking lot and stopped. Axvig came running out of the building, ran around the car, and got in the front seat with Myers. Myers drove, and proceeded to an area known as the tank trails on the Fort Riley military reservation. Myers stopped the car, and eventually told Elke to get out. She and Axvig got out of the car. Myers drove off, leaving Elke and Axvig at the tank trails. Myers returned in about an hour, driving a different vehicle. The three then drove to Myers' house trailer, where Elke was taken inside and left with Myers' wife. Myers and Axvig left; Myers returned

alone after an hour or more. Mrs. Myers then drove Elke back to her sister's apartment.

In the interim, Cristel went to the apartment of friends and called Sands to report the events to him. With several other young people, she returned to her apartment about an hour later and discovered the body of Kevin Kitchens in Elke's bedroom. He had been shot twice in the back of the head. The police were called and came to the scene. Elke and Mrs. Myers returned to find the police at the apartment. Myers was arrested later the same day, and both he and Axvig were charged with the felony murder of Kevin Kitchens, the kidnapping of the two young women, and aggravated burglary. Axvig was found murdered some months later in the State of Oklahoma.

Both Cristel and Elke testified that Myers was calm and deliberate throughout; Axvig said little, if anything. Myers did all of the talking and appeared to be completely in charge. Neither young woman ever saw Axvig point a weapon at Myers, or otherwise threaten him. Elke testified that she had been in the military service, stationed at Fort Riley, and that she had some familiarity with handguns of the type carried by Myers and Axvig, which she identified as Army-type .45 caliber automatic pistols, clip-fed through the bottom. She did not see a hole in the bottom of Myers' gun, where the clip is inserted, and she thinks that she would have noticed if there had been no ammunition clip in the weapon.

At trial, the defendant indicated that he planned to introduce evidence of compulsion, that Axvig disarmed him immediately before the two men entered the girls' apartment in the early morning hours of September 11, 1979, and that his actions thereafter were directed and compelled by Axvig. Our statute relating to the defense of compulsion is K.S.A. 21-3209. It provides:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

The trial court, after receiving the defendant's proffered testi-

mony on compulsion out of hearing of the jury, ruled that the defense of compulsion is not available to one charged with felony murder; that neither Myers nor his family were under any threat of immediate harm; and that Myers was provided with various reasonable opportunities to escape or withdraw from the criminal activity and failed to do so. The court concluded that the proffered evidence did not establish compulsion, that the defense of compulsion was not available under the proffered facts, and that the proffered evidence could not be used for the purpose of establishing a compulsion defense. The record disclosing the proffer is as follows:

"THE COURT: . . . [L]et me ask a little bit more specificity in regard to the proffer. What is [the defendant] going to testify as to what Axvig said and what the situation was? . . .

"MR. ARTHUR [counsel for the defendant]: Okay, at the time they arrived at the Watson apartment the second time, testimony would be that Axvig pulled a gun on Joe Myers, took his gun away from him, took the clip out of it, gave it back to him and said, 'I have your family, do as I tell you or they'll be hurt.' They went in to the apartment, Axvig testified at that point in time or, excuse me, stated that he was going to tie up Kevin Kitchens and knock him out.

"THE COURT: Again, I want you to remember that I indicated that that's an anticipatory thing that he might do and I don't want that in under—in regard to Axvig said.

"MR. ARTHUR: Your Honor, I need Mr. Myers to help me at this point.

"THE DEFENDANT: He told me to go inside the apartment. I was inside the apartment before he stated that there was somebody at the house with Nanette and the kids. He never—when it comes to tying up Kevin and knocking him out, that falls in a whole different category, that is where Cristel and Elke were seated in the living room.

"MR. ARTHUR: I know it was later.

"THE COURT: Let me ask you this, another thing as well, that is, how did that clip get out of Mr. Myers' gun? Theoretically that's going to be a factor here.

"MR. ARTHUR: Axvig put the gun to Mr. Myers' head and reached around in his holster, pulled the gun out and the clip just drops out if you press a button.

"THE COURT: That's what his testimony is going to be?

"MR. ARTHUR: Right."

The controlling issue in this case is whether the evidence of compulsion proffered by the defendant was sufficient to allow that evidence to go to the jury, and sufficient to require that an instruction on compulsion be given. The defense of compulsion was discussed at length in the case of *State v. Milum,* 213 Kan. 581, 582, 516 P.2d 984 (1973), where we said:

"Insofar as this case is concerned the key statutory phrase is that the threat must be of the 'imminent' infliction of death or great bodily harm. The codifica-

tion thus embodies the common law characteristics of the defense exemplified by the encyclopedists:

" '. . . In order to constitute a defense, the coercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. . . . The doctrine of coercion or duress cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm. And threat or fear of future injury is not sufficient.' 21 Am. Jur. 2d, *Criminal Law*, § 100.

" 'The compulsion or coercion which will excuse the commission of a criminal act must be present, imminent, and impending, and of such a nature as to induce a well grounded apprehension of death or serious bodily harm if the act is not done; it must be continuous, and there must be no reasonable opportunity to escape the compulsion without committing the crime. A threat of future injury is not enough, particularly after danger from the threat has passed.' 22 C.J.S., *Criminal Law*, § 44."

In the more recent case of *State v. Harrison*, 228 Kan. 558, 560, 618 P.2d 827 (1980), we quoted from *Milum* and then said:

"The general rule followed throughout the country is that in order for the defense of compulsion to be established it must be shown that the accused was without a reasonable opportunity to escape or withdraw from the criminal activity."

In the case at hand, the evidence with regard to Myers' opportunity to escape, to withdraw from the criminal activity, or to alert others and seek help, is abundant. Myers was alone with Cristel in her bedroom, and he made no effort to communicate to her, or to others over her telephone, that he was under compulsion from Axvig. To the contrary, he told Cristel in substance that this was a "rip off," and that he had his family waiting to leave town with the money he would make from the fifteen pounds of marijuana. At a later point, he was alone with Cristel and Elke in the living room of the apartment, near the front door, while Axvig was in the bedroom with Kitchens; Myers made no effort to leave at that time, or to permit the two women to escape. Again, when he took the two women outside, leaving Axvig in the apartment, Myers took Elke to the car, put her in it, and instead of speeding off to make his escape, he drove slowly, stopped, and waited to pick up Axvig. Some time later, he left Axvig and Elke at the Fort Riley tank trails and was away from Axvig for at least an hour before returning to pick them up. At that time he made no attempt to escape, to check on his family, or to notify the authorities. Finally, after he took Axvig somewhere and returned alone to his (Myers') apartment, Myers did not tell his wife and

Elke about any coercion or forced participation, nor did he alert the authorities and report the matter to them so that Axvig could be apprehended.

Compulsion, to constitute a defense under K.S.A. 21-3209, must be present, imminent, and impending; it must be continuous; there must be no reasonable opportunity to escape the compulsion without committing the crime. Here, under the proffered evidence, the compulsion was imminent when Myers entered the apartment; thereafter, when Myers was out of the sight and presence of Axvig, it was not imminent. The compulsion was not continuous; Myers and Axvig went their separate ways and operated independently; the compulsion was interrupted time after time. Finally, Myers had abundant opportunities to make his escape, and failed to do so. Myers could have freed the women before or at the time they left the apartment, and he could have made his escape before the murder was committed.

We recognize, of course, that a trial court in a criminal action has a duty to instruct the jury on the law applicable to the theories of both the prosecution and the accused, so far as those theories are supported by any competent evidence. *State v. Farmer,* 212 Kan. 163, 510 P.2d 180 (1973). Further, when considering the refusal of a trial court to give instructions requested by the defendant, we must consider the evidence supporting those instructions in the light most favorable to the defendant. *State v. Farmer,* 212 Kan. at 167. Viewing the proffered testimony in this light, we conclude that such evidence would not, as a matter of law, have established the defense of compulsion under K.S.A. 21-3209 for the reasons above set forth. The trial court did not err in refusing to admit the testimony for the stated purpose, or in refusing to instruct the jury on the defense of compulsion. The resolution of this issue is dispositive of this appeal and it is not necessary to reach the other issues raised.

We have carefully examined the record on appeal and find no prejudicial error. The defendant was afforded a full and fair trial.

The judgment is affirmed.