No. 58,974

STATE OF KANSAS, *Appellee,* v. JAMES C. HUNTER, *Appellant.*

(740 P.2d 559)

630

Opinion filed July 17, 1987.

*Robert J. Lewis, Jr.,* of Lewis, Lewis & Beims, of Atwood, argued the cause and was on the brief for appellant.

*Perry Murray,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant James C. Hunter appeals his convictions of two counts of felony murder, two counts of aggravated kidnapping, one count of aggravated robbery, one count of aggravated battery on a law enforcement officer, and one count of aggravated battery. Hunter raises numerous issues, among them that the trial judge committed reversible error by refusing

Hunter's requested instruction on his defense of compulsion. We reverse and remand for a new trial.

In February 1985 James C. Hunter, a resident of Amoret, Missouri, was hitchhiking from Texas back to the Kansas City area. He arrived in Wichita on February 12, 1985. On February 13, Hunter hitched a ride with Mark Walters, Lisa Dunn, and Daniel Remeta. On the way north on I-135, Remeta displayed two weapons, a .357 Magnum and an inoperative .22 pistol. Hunter repaired the .22 and Remeta fired the .22 out of the car window several times. When they reached the intersection of I-135 and I-70, Hunter asked to be let off. At that point Remeta began talking about another hitchhiker he wished he had killed and also described prior crimes he had committed, including several murders.

At the Levant exchange on I-70, Dunn, Walters, Remeta, and the defendant were pulled over by a police car. The driver of the police car was Thomas County Undersheriff Benjamin F. Albright, who had been asked to investigate a vehicle matching the description of the car. Albright instructed the occupants to remain in the car and put their hands on the ceiling. One of the passengers exited the car and fired two shots through Albright's windshield. Albright identified the person who fired these shots as having shoulder-length brown hair and a full beard. This description matched that of the defendant. Immediately thereafter, Albright was shot by the same person in the arm and chest. At trial, Albright identified James Hunter as his assailant. Hunter, Dunn, and Remeta all testified that it was Remeta who shot Albright. Hunter testified that, after Albright was shot, he attempted to shoot Remeta with the .22 handgun but accidentally wounded Dunn. Dunn and Remeta corroborated this testimony.

Shortly after the Albright shooting, the Remeta vehicle reached the Bartlett Elevator in Levant, Kansas. There were eight individuals at the elevator: Maurice Christie, the elevator manager; Fred Sager, the assistant manager; and Dennis Tubbs, Raymond Haremza, Rick Schroeder, Glenn Moore, and two others. The testimony concerning Hunter's activities at the Levant elevator conflicted greatly. Christie testified that he observed "a bearded man," later identified as Hunter, holding a gun in the face of Rick Schroeder and forcing him into a pickup

truck. Sager testified that he saw a bearded man with a gun in his hand and that Rick Schroeder got into the pickup by himself. Dennis Tubbs testified that Hunter held Schroeder's arm and told him to get into the pickup; he further testified he saw only one person with a gun. After Rick Schroeder and Glenn Moore were taken as hostages and loaded into Moore's pickup truck, Christie, while attempting to call the sheriff from the scale house, was shot by Remeta.

Following the shooting at the elevator, the hostages were driven to a point north of U.S. Highway 24 near Colby, Kansas. Remeta testified that he killed both Schroeder and Moore and left them at the side of the road. Police caught up with the pickup truck and forced it off the road at a farm. During an exchange of gunfire, Walters was killed. Subsequently, Remeta, Dunn, and Hunter were arrested.

Remeta, Dunn, and Hunter were formally charged on February 15, 1985. A preliminary hearing was held, after which all three defendants were bound over. At the arraignment, all defendants refused to enter a plea and the trial court entered pleas of not guilty on behalf of all three. Prior to trial, Remeta entered a plea of guilty to all charges. Dunn and Hunter were tried by a jury, found guilty of all counts, and sentenced to consecutive terms. Hunter now appeals his conviction of two counts of felony murder (Schroeder and Moore), two counts of aggravated kidnapping (Schroeder and Moore), one count of aggravated battery on a law enforcement officer (Albright), one count of aggravated battery (Christie), and one count of aggravated robbery.

## MOTION FOR SEVERANCE

Initially, Hunter contends that the trial court erred in refusing to grant him a separate trial from Dunn. Originally Remeta, Dunn, and Hunter were charged by separate complaints for identical crimes. The State's motion for joinder of the preliminary hearings and trials was granted. Following arraignment, each defendant filed a motion for severance which was denied.

Two or more defendants may be charged in the same complaint, information, or indictment if they are alleged to have participated in the same act or series of acts constituting the crime or crimes. K.S.A. 22-3202(3). Two or more defendants, charged in separate complaints or informations which allege that

the defendants have participated in the same act or acts, may be later joined for trial if the defendants could have been charged in the same complaint, information, or indictment. *State v. Tate*, 228 Kan. 752, 620 P.2d 326 (1980).

When two or more defendants are jointly charged with a crime, the court may order a separate trial for any one defendant. K.S.A. 22-3204. Severance under 22-3204 lies within the sound discretion of the trial judge. *State v. Myrick & Nelms*, 228 Kan. 406, 416, 616 P.2d 1066 (1980). In order for a separate trial of a joint defendant to be granted, the movant must present to the trial judge grounds sufficient to establish actual prejudice. *State v. Jones*, 222 Kan. 56, 58, 563 P.2d 1021 (1977).

The usual grounds for granting a motion for severance are: (1) The defendants have antagonistic defenses; (2) important evidence in favor of one of the defendants which would be admissible in a separate trial would not be allowed in a joint trial; (3) evidence incompetent as to one defendant which can be introduced against another would work prejudicially to the former with the jury; (4) a confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants. *State v. Pham*, 234 Kan. 649, 653, 675 P.2d 848 (1984) (citing *State v. Martin*, 234 Kan. 548, 673 P.2d 104 [1983]).

At the joint trial, Dunn requested and was granted a motion in limine to exclude evidence of other crimes she was alleged to have committed. Hunter argues that when the trial court granted Dunn's motion in limine, evidence important to his case was excluded; namely, evidence that charges were pending for crimes allegedly committed by Remeta and Dunn in Arkansas, Texas, Michigan, Florida, and Gove, Kansas, immediately prior to the crimes in question, and also specific statements by Hunter and Dunn concerning these crimes. Hunter contends that the subsequent denial of a separate trial seriously prejudiced his defense and constitutes reversible error. We disagree.

Throughout the trial, Hunter's compulsion defense rested on the magnitude of his fear of Remeta, not of Dunn. Thus, any evidence regarding charges against Dunn for prior crimes would

not have been relevant. The fact that after Hunter's arrest Remeta was subsequently charged with other offenses was also not relevant to the defense of compulsion. Evidence of events subsequent to an arrest is generally not relevant to show that an individual was compelled to commit the prior criminal acts. The trial judge correctly determined that evidence of Remeta's and Dunn's subsequent charges should be excluded, but incorrectly chose K.S.A. 60-455 as the reason for the exclusion. This statute provides that evidence that a person committed a crime or a civil wrong may be admitted under limited circumstances to prove something other than the person's predisposition to commit a crime.

It is only Remeta's description of his prior crimes which could have explained the reasonableness of Hunter's fear of Remeta. Only these statements are relevant to the compulsion defense. Although Hunter also argues that detailed testimony of Remeta's prior criminal activities was excluded, the record shows that Hunter, Remeta, and Dunn were allowed to testify about Remeta's statements concerning multiple murders he had committed and a hitchhiker he wished he had killed. Hunter is unable to demonstrate that his defense was prejudiced because important evidence was excluded in the joint trial. The trial court properly denied the motion for severance.

## CHANGE OF VENUE

Hunter next contends that the trial court erred in denying his motion for change of venue pursuant to K.S.A. 22-2616(1), which provides:

"In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

The determination of whether to change venue lies within the sound discretion of the trial court and will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant, with the burden upon the defendant to show prejudice in the community, not as a matter of speculation, but as a demonstrable reality. The defendant must show that such prejudice existed in the community that it was reasonably certain

he could not have obtained a fair trial. There must be more than speculation that the defendant did not receive a fair trial. The State is not required to produce evidence refuting that of the defendant. *State v. Ruebke*, 240 Kan. 493, Syl. ¶¶ 2, 3, 731 P.2d 842 (1987).

At the original hearing on the motion for a change of venue, defendant urged the court to consider the following factors:

(1) Extensive pretrial media coverage of the crime.

Media publicity alone has never established prejudice per se. *State v. Ruebke*, 240 Kan. at 500; *State v. Porter*, 223 Kan. 114, 117, 574 P.2d 187 (1977). It is the defendant's burden to show that the publicity has reached the community to such a degree that it is impossible to get an impartial jury. *State v. May*, 227 Kan. 393, 394-95, 607 P.2d 72 (1980). There is no question but that the crimes committed shocked the surrounding communities and that the local media reflected this outrage. These facts alone, however, do not entitle defendant to a change of venue. See *State v. Myrick & Nelms*, 228 Kan. at 417. The news reports were factual and not inflammatory and Hunter presented no evidence to show the media attempted to influence the outcome of the trial. See *State v. Sanders*, 223 Kan. 273, 279, 574 P.2d 559 (1977). The one inaccuracy which might have resulted in prejudice to Hunter was an early report that he was a participant in Remeta's and Dunn's "crime spree" in other states. This misinformation was ultimately corrected by the news media prior to trial.

(2) The receipt by the sheriff's department of two threatening phone calls regarding the defendants and their ultimate removal to another jail, and fourteen affidavits from community members in which the affiants stated that defendants could not receive a fair trial in Thomas County.

Defendant, however, was unable to show that such isolated sentiments permeated the community as a whole.

(3) A petition sent to Governor Carlin's office a few days after the crimes were committed urging the governor to sign the death penalty bill.

The petition included 1550 signatures, 67 percent from Thomas County. It urged the governor to support the death penalty; however, there was no reference either to the crimes in

Thomas County or to the defendants in this case. A representative from the governor's office testified at the hearing on the change of venue motion that the petition was received at the time the death penalty was being considered by the Kansas legislature and was one of many petitions and other communications supporting the death penalty received by the governor at this time. While the petition may indicate strong feelings in favor of the death penalty among some residents of Thomas County as a result of the crimes, it does not indicate that a fair trial could not be conducted in the community.

(4) The fact that out of 95 jury panel members questioned, 89 knew at least one of the victims and that five members of the final jury panel knew one or more of the victims.

When crimes occur in rural areas, it is inevitable that members of the jury panel will be acquainted with trial participants or victims. In such cases we must examine the jury selection process to determine whether defendant's rights to a fair trial have been jeopardized. As we have stated, the difficulty in selecting a fair and impartial jury is an important factor in weighing a claim of prejudice. *State v. Ruebke*, 240 Kan. at 500; *State v. Myrick & Nelms*, 228 Kan. at 418. In this case, a jury panel was passed for cause after one and one-half days of voir dire. From a panel of 143 prospective jurors, 39 were excused for cause, 51 were dismissed by peremptory challenges, and 39 were excused from service; twelve jurors and two alternates served. There appears to have been no difficulty in selecting an impartial jury. Although five of the final twelve jurors stated they were acquainted with one or more of the victims, none admitted to a close friendship and each stated under oath that he or she would be able to remain fair and impartial. In order to find that defendant has established prejudice, we would have to assume that these jurors violated their oaths; this we cannot do.

Hunter has failed to prove that there existed such prejudice in Thomas County that he reasonably could not have received a fair trial. The trial court did not abuse its discretion in denying defendant's motion for change of venue.

## PRIOR INCONSISTENT STATEMENT

Hunter next argues that the trial court erred in limiting cross-examination regarding a prior inconsistent statement of a State's

witness. Maurice Christie, the manager of the Levant grain elevator who was shot by Remeta, testified on direct that he saw Hunter hold a gun on Rick Schroeder and force him into the pickup truck. On cross-examination, defendant attempted to impeach Christie with a prior inconsistent statement reported in the Kansas City Star on February 17, 1985. Christie was handed the newspaper and given an opportunity to review the article. Defendant's attorney then began to question Christie on individual statements. Christie denied the first statement, after which the prosecution objected stating that further questioning would "prejudice and inflame the passions of this jury." The trial court, incorrectly relying on K.S.A. 60-422(b), sustained the motion and prevented defendant's attorney from further impeachment of the State's witness by use of the newspaper article.

Under K.S.A. 60-401(b) and K.S.A. 60-407(f), all relevant evidence is admissible if it tends to prove a material fact. Where a witness has made a prior inconsistent statement of a relevant fact, that evidence is admissible. If the witness had written a statement that was inconsistent with his testimony, the defendant's attorney would have the right to cross-examine the witness by use of the written statement, subject to foundation requirements imposed by the judge. K.S.A. 60-422(a).

A newspaper article, however, is actually a statement by a reporter of a purported statement made by the witness testifying. Here, the newspaper article was offered to prove that Christie made a prior inconsistent statement and thus fits the classical definition of hearsay. Because the statement does not fall within one of the many exceptions to the hearsay rule listed in K.S.A. 1986 Supp. 60-460, the newspaper article was inadmissible. The proper procedure to introduce the evidence would have been to have the author of the article testify and then be examined about the prior inconsistent statement. The author would be subject to cross-examination by the State and the jury would have had the opportunity to observe the witness while testifying. For these reasons the evidence was properly excluded.

## REBUTTAL WITNESS

Hunter also asserts that the trial court erred in permitting the testimony of an unendorsed rebuttal witness, Boyd Touslee, and

in not granting a motion to strike or for a mistrial. Defendant did not object to Touslee's testimony until after it was completed.

K.S.A. 1986 Supp. 22-3201(6) provides:

"The prosecuting attorney shall endorse the names of all witnesses known to the prosecuting attorney upon the complaint, information and indictment at the time of filing it. The prosecuting attorney may endorse on it the names of other witnesses that may afterward become known to the prosecuting attorney, at times that the court may by rule or otherwise prescribe."

K.S.A. 1986 Supp. 22-3201(6) makes late endorsement of the State's witnesses discretionary with the trial court. *State v. Thompson*, 232 Kan. 364, 367, 654 P.2d 453 (1982) (citing *State v. Ferguson, Washington & Tucker*, 228 Kan. 522, 618 P.2d 1186 [1980]). Normally, late endorsement is permitted if the opposing parties are given time to interview the witnesses and cross-check their testimony. *State v. Ferguson, Washington & Tucker*, 228 Kan. at 526. However, special rules apply in the case of rebuttal witnesses. We have consistently held that a prosecuting attorney is not required to endorse the names of rebuttal witnesses. *Talley v. State*, 222 Kan. 289, 292, 564 P.2d 504 (1977) (citing *State v. Bean*, 181 Kan. 1044, Syl. ¶ 1, 317 P.2d 480 [1957]). Thus, the trial court did not abuse its discretion in allowing Touslee's testimony.

Even if the admission of the testimony had constituted abuse of discretion, actual prejudice to defendant's ability to defend must be shown in order to reverse. *State v. Thompson*, 232 Kan. at 367. Defendant argues that Touslee's testimony that he had observed Hunter seated on the passenger side of the front seat of the vehicle was highly damaging since it contradicted defendant's testimony that he had never been seated in the front. However, another rebuttal witness also testified that he saw a man with a beard in the front seat of the car, so it appears unlikely that defendant's case was prejudiced by Touslee's testimony.

Further, the defendant failed to object to the testimony until after it was completed. The failure to object to a witness whose name is not endorsed on the information until the examination of the witness is concluded constitutes waiver. *State v. Cook*, 225 Kan. 259, Syl. ¶ 1, 589 P.2d 616 (1979).

## AIDING AND ABETTING

Hunter next argues that the trial court erred in failing to

instruct the jury that mere association by a defendant with codefendants should not be considered to imply that the defendant aided and abetted in the crime. The court's Instruction No. 11 follows PIK Crim. 2d 54.05:

"A person who, either before or during its commission, intentionally aids or abets another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

The defendant had requested that either of the following instructions be added to the above instruction given by the trial court:

(1) "Mere association with the person or persons who actually commit the crime or the mere presence in the vicinity of the crime are themselves insufficient to establish that a person is responsible for the crimes of another." or

(2) "Mere association with the principal or principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider and abettor. To be guilty of aiding and abetting a person must willfully and knowingly associate herself with the unlawful venture and willfully participate in it as she would in something she wishes to bring about or to make succeed."

There is no pattern instruction comparable to defendant's requested additional instruction. Defendant cites as authority for the instruction *State v. Green*, 237 Kan. 146, 697 P.2d 1305 (1985), and *State v. Burton*, 235 Kan. 472, 681 P.2d 646 (1984). Although both *Green* and *Burton* held that mere association with principals is not sufficient to establish guilt as an aider and abettor, neither case mandated the giving of such an instruction. Defendant's alleged error is identical to that raised in *State v. Minor*, 229 Kan. 86, 622 P.2d 998 (1981), and *State v. Walters*, 8 Kan. App. 2d 237, 655 P.2d 947 (1982). In both cases, we held that the PIK instruction given clearly informed the jury that intentional acts by a defendant must be proved to convict for aiding and abetting and, thus, proof of mere association or presence would be insufficient to convict. Therefore, the refusal to give defendant's requested instruction was not error.

## COMPULSION

For his final point on appeal, Hunter contends that the trial court committed reversible error by refusing to instruct the jury on his defense of compulsion. We agree. K.S.A. 21-3209 provides

for the defense of compulsion to crimes other than murder or manslaughter, stating:

(1) "A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

(2) "The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

Defendant's requested instruction, taken from PIK Crim. 2d 54.13, stated:

"It is a defense to the charges of Aggravated Battery Against a Law Enforcement Officer, Aggravated Robbery and Aggravated Kidnapping, if the defendant acted under compulsion or threat of immediate infliction of death or great bodily harm, and if said defendant reasonably believed that death or great bodily harm would have been inflicted upon said defendant had he or she not acted as he or she did."

The trial court refused to give the compulsion instruction because the defendant was charged with premeditated and felony murder. The judge was unsure if the instruction was applicable where an individual is charged under the felony-murder rule, but determined that one who aids and abets felony murder is not entitled to the instruction.

Whether the defense of compulsion is available to a criminal defendant charged with felony murder under K.S.A. 21-3401 is an issue of first impression. Most modern statutes providing for a defense of compulsion evolved from the common-law policy that a person, when faced with a choice between suffering death or serious bodily harm and committing some lesser crime, could not be punished for committing the lesser offense. LaFave and Scott have explained the rationale of this "choice of evils" approach as follows:

"One who, under the pressure of an unlawful threat from another human being to harm him (or to harm a third person), commits what would otherwise be a crime may, under some circumstances, be justified in doing what he did and thus not be guilty of the crime in question. . . . The rationale of the defense is not that the defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question. Rather it is that, even though he has the mental state which the crime requires, his conduct which violates the

literal language of the criminal law is justified because he has thereby avoided harm of greater magnitude." LaFave and Scott, Handbook on Criminal Law 374 (1972).

However, even early cases refused to recognize any compulsion as sufficient to excuse intentional killing. See *Arp v. State*, 97 Ala. 5, 12 So. 301 (1893); *State v. Nargashian*. 26 R.I. 299, 58 A. 953 (1904). The rationale is that, when confronted by a choice between two evils of equal magnitude, the individual ought to sacrifice his own life rather than escape by the murder of an innocent. See Perkins, Criminal Law 951 (1969), citing 4 Blackstone, Commentaries 30.

A number of jurisdictions, including Kansas, have incorporated by statute the common-law denial of the compulsion defense in crimes of murder. See *e.g.* Ariz. Rev. Stat. Ann. § 13-412 (1978); Colo. Rev. Stat. § 18-1-708 (1986); Ga. Code Ann. § 16-3-26 (1984); Ind. Code Ann. § 35-41-3-8 (Burns 1985); Ky. Rev. Stat. Ann. § 501.090 (Michie 1985); Me. Rev. Stat. Ann. tit. 17-A, § 103-A (1983); Mo. Rev. Stat. § 562.071 (1986); Or. Rev. Stat. § 161.270 (1985); Wash. Rev. Code § 9A.16.060 (1985). While not all jurisdictions have considered the applicability of these statutes to crimes of felony murder, we note that both Arizona and Missouri have held that defendants are barred from claiming the compulsion defense in felony-murder cases. They reason that the person charged need only have the required intent to commit or participate in the underlying felony and no other mental state on his part need be demonstrated because of the strict liability imposed by the felony-murder rule. See *State v. Berndt*, 138 Ariz. 41, 672 P.2d 1311 (1983); *State v. Rumble*, 680 S.W.2d 939 (Mo. 1984).

We are not, however, persuaded by the reasoning of these decisions. The better view, consistently adhered to by commentators, is that any limitation to the defense of duress be confined to crimes of intentional killing and not to killings done by another during the commission of some lesser felony. As LaFave and Scott have explained:

"[I]f *A* compels *B* at gunpoint to drive him to the bank which *A* intends to rob, and during the ensuing robbery *A* kills a bank customer *C*, *B* is not guilty of the robbery (for he was justified by duress) and so is not guilty of felony murder of *C* in the commission of robbery. The law properly recognizes that one is justified in

aiding a robbery if he is forced by threats to do so to save his life; he should not lose the defense because his threateners unexpectedly kill someone in the course of the robbery and thus convert a mere robbery into a murder." p. 377.

See Perkins at 952; accord Hitchler, *Duress as a Defense in Criminal Cases,* 4 Va. L. Rev. 519, 528-30 (1917).

This reasoning was adopted in *Tully v. State,* 730 P.2d 1206 (Okla. 1986), where the Court of Criminal Appeals of Oklahoma recently held that the defense of compulsion was available to a defendant charged with first-degree felony murder. *Tully* involved a defendant who allegedly was compelled to rob a man fatally beaten by Tully's threatener. The trial court refused defendant's requested instruction on compulsion, and on appeal the State argued that the defense was foreclosed in cases of felony murder. The Oklahoma court disagreed, reversed defendant's conviction, and remanded for a new trial.

While Oklahoma does not statutorily preclude the compulsion defense in murder cases, the Oklahoma court found that, although the common law proscribes the defense of compulsion in cases of intentional killing, the defense should attach where the defendant commits the underlying felony and not the killing, as long as the defendant has reason to believe his life is in danger unless he participates. 730 P.2d at 1210. We agree and believe that the limitation to the use of the compulsion defense is restricted to crimes of intentional killing and that, where compulsion is a defense to an underlying felony under K.S.A 21-3209 so that the felony is justifiable, compulsion is equally a defense to charges of felony murder.

The State argues that, even if compulsion is a defense to felony murder, Hunter is precluded from claiming the defense while denying he committed the crimes, citing *State v. Farmer,* 212 Kan. 163, 167, 510 P.2d 180 (1973), which dealt with the defense of entrapment. The State asserts that the compulsion statute, K.S.A. 21-3209, like the entrapment statute, K.S.A. 21-3210, contemplates that criminal conduct has been performed and that, since the defendant is now attempting to excuse such conduct, it is inconsistent to deny the charges and claim compulsion.

In homicide cases, however, we have held that, notwithstanding the fact that the accused denies having committed the murder, he is entitled to an instruction on self-defense *if that issue is*

*raised by the evidence. State v. Smith,* 161 Kan. 230, 167 P.2d 594 (1946). In *Smith,* this court granted the defendant a new trial based on the court's failure to give a self-defense instruction, despite the fact that the defendant denied committing the offense and that the defense did not request a self-defense instruction. During trial, testimony by the defendant and the other witness to the crime disclosed facts which could have supported a self-defense theory. Our holding in *Smith* is in line with the well-established rule in homicide cases that whether a defendant is entitled to an instruction on self-defense depends solely on whether facts supporting this defense have been admitted into evidence. See *State v. Jackett,* 81 Kan. 168, 105 Pac. 689 (1909); *State v. Heiskell,* 8 Kan. App. 667, 666 P.2d 207 (1983). See also 40 Am. Jur. 2d, Homicide § 521.

We disagree with the State's contention that the defense of compulsion is more similar to entrapment than to self-defense. The doctrine of entrapment has evolved in recent years as a curb to seriously improper law enforcement conduct. Unlike more common defenses such as self-defense and compulsion, entrapment is not pled to establish justification for committing a crime, but rather to present facts collateral to the crime which justify acquittal on the grounds of public policy. 21 Am. Jur. 2d, Criminal Law 204, p. 372. The rule that the defense of entrapment is not available to one who denies the offense appears to be an *exception* to the general rule that inconsistent defenses are generally permissible in criminal prosecutions. 22 C.J.S., Criminal Law § 54. Kansas modified this general rule even in entrapment cases, in *State v. Farmer,* 212 Kan. 163. In *Farmer,* the defendant was charged with delivering a drug to a law enforcement officer. He pled not guilty, claiming entrapment but, at the same time, admitted most of the elements of the offense. We held that despite inconsistent defenses, the evidence required submission of the entrapment defense to the jury. 212 Kan. at 167. Relying on *Farmer,* we implicitly adopted the rule allowing inconsistent defenses in *State v. Myers,* 233 Kan 611, 616, 664 P.2d 834 (1983), a compulsion case, where we held that all theories of the prosecution and the defense supported by evidence must be submitted to the jury.

Following the rationale of *Myers,* we hold that a defendant is

not precluded from asserting a compulsion defense by denying commission of the crime where the compulsion issue is raised by the evidence.

In a criminal action, a trial court must instruct the jury on the law applicable to the theories of all parties where there is supporting evidence. *State v. Davis*, 236 Kan. 538, Syl. ¶ 4, 694 P.2d 418 (1985). Here, the evidence supported several theories: that Hunter committed some of the crimes, that he aided and abetted the perpetrator in some or all of the crimes, that he acted throughout under compulsion, or that he was an innocent bystander. When considering the refusal of a trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. *State v. Myers*, 233 Kan. at 616. We must determine whether there was evidence, when viewed in the light most favorable to the defendant, sufficient to require a compulsion instruction.

Hunter testified to the following pertinent facts regarding reasons for his fear of Remeta prior to the incident at the Levant elevator:

(1) On the trip from Wichita to Salina, Remeta fired the .22 three times out of the car window.

(2) When Hunter asked to be let out of the car as they reached Salina, Remeta refused and began to talk about a hitchhiker he wished he had killed.

(3) Remeta then took out two .357 Magnum bullets and asked Hunter if he thought they could kill him (Hunter).

(4) Remeta then told Hunter he had shot a girl five times with one of the weapons.

(5) Later, Remeta fired the .22 in the direction of Hunter while the car was stopped.

(6) Remeta told Hunter he had killed a man for $40 and had killed twelve other people.

With regard to the shooting of Undersheriff Albright, Hunter, Remeta, and Dunn all testified that it was Remeta who shot Albright and that Hunter, in attempting to stop Remeta, accidentally shot Dunn with the .22. Albright testified that Hunter shot him.

There were three versions of the events at the grain elevator in

Levant. First, State's witnesses Christie, Sager, and Tubbs all testified that Hunter had played an active role in the kidnapping of Schroeder and Moore and the theft of the pickup truck. Christie and Sager testified that Hunter had a weapon. Second, Hunter testified that he had no weapon at the elevator and that he was ordered by Remeta to go to the other end of the building to watch to see if anyone tried to exit through the back door. According to Hunter, he then walked around to the back of the building and stopped there to wait to see what happened, and Remeta then ordered him back around to the other side and into the pickup. Hunter testified that he never felt he had a chance to escape. Third, Remeta testified that he had both guns at all times. He further stated that he asked Hunter to watch Schroeder and Moore at the pickup truck and that he would have shot Hunter if he had not followed orders.

In order to constitute the defense of compulsion, the coercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The doctrine of coercion or duress cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm. *State v. Milum*, 213 Kan. 581, 582, 516 P.2d 984 (1973). In addition, the compulsion must be continuous and there must be no reasonable opportunity to escape the compulsion without committing the crime. *State v. Myers*, 233 Kan. at 616.

The only opportunity Hunter would have had for escape would have been when he was out of sight of Remeta at the point when he went around the north side of the building at the Levant elevator. Hunter testified that Remeta came around the building and ordered him to return to the pickup. There was testimony that the total time which elapsed at the grain elevator was approximately five minutes. From the record, it is impossible to tell how long Hunter remained out of sight of Remeta. Viewed in the light most favorable to Hunter, however, and particularly in light of the fact that it was undisputed that Remeta had possession of the .357 Magnum at all times, it cannot be said that Hunter had a reasonable opportunity to escape.

Although some of the evidence supporting Hunter's defense of

compulsion came from Hunter's own testimony, this court has held that a defendant is entitled to an instruction on his or her theory of the case even though the evidence is slight and supported only by defendant's own testimony. *State v. Sullivan & Sullivan,* 224 Kan. 110, Syl. ¶ 10, 578 P.2d 1108 (1978); *State v. Heiskell,* 8 Kan. App. at 673. In this case, evidence came not only from Hunter, but also from Remeta and the State's witnesses Christie, Sager, and Tubbs. There was ample evidence presented from which the jury could have concluded that Hunter's acts were justified by compulsion.

Here, the record is replete with testimony that Daniel Remeta was a person to be feared. It was the function of the jury as the exclusive trier of fact to determine if it was believable that Hunter was afraid for his life, if such fear was reasonable, and if such fear justified any criminal acts which Hunter may have performed. When the trial judge refused the requested compulsion instruction, he effectively prevented the jury from considering the evidence presented in Hunter's defense. This denial of the jury's right to determine the facts constitutes reversible error. We reverse and remand this case for a new trial in accordance with this opinion. Because the resolution of this issue is dispositive of this appeal, we do not reach the other issues raised.