**Lisa DUNN, Petitioner,**

v.

**Raymond ROBERTS, et al., Respondents.**

**No. 90–3138–S.**

United States District Court, D. Kansas.

June 18, 1991.

Jessica R. Kunen, Chief Appellate Defender, Topeka, Kan., David Gottlieb, Professor of Law, Lawrence, Kan., Lisa Nathanson, Professor, School of Law, Topeka, Kan., Richard Ney, Chief Defender, Sedgwick County Public Defender, Wichita, Kan., for petitioner.

John K. Bork, Asst. Atty. Gen., Kansas Judicial Center, Topeka, Kan., for respondents.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter comes before the court on a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner, an inmate at the Kansas Correctional Institute, Lansing, Kansas, was convicted in 1985 in the District Court of Thomas County, Kansas, of two counts of felony murder, two counts of aggravated kidnapping, one count of aggravated battery on a law enforcement officer, one count of aggravated robbery, and one count of aggravated battery. 243 Kan. 414, 758 P.2d 718. Petitioner was originally sentenced to four consecutive terms of life imprisonment and two consecutive terms of 15 years to life;

however, these sentences were later modified to be served concurrently.

In this action, petitioner challenges her conviction on three grounds, alleging (1) the district court's failure to allow a change of venue resulted in a violation of her right to due process and her right to an impartial jury; (2) the denial of funds for expert services violated her right to due process and effective assistance of counsel; and (3) the district court's refusal to instruct the jury on compulsion violated her right to due process.

A hearing on the petition was conducted before this court on April 24, 1991. The court, having examined the record and considered the arguments of the parties, now makes the following findings and order.

Factual Background

Petitioner was born and raised in Traverse City, Michigan, and lived there until shortly before the crimes at issue in this petition were committed. Although petitioner had been a good student and participated in numerous activities, her behavior and academic performance began to decline when she was 15. During this period, petitioner began to associate with a new peer group and to use drugs and alcohol. Petitioner left home briefly at the age of 17 but returned after she allegedly was sexually assaulted while hitchhiking.

Petitioner's relationship with her parents continued to deteriorate after her return home, although she completed her high school education and began to attend a local college. In December 1984 petitioner, then 18, met Daniel Remeta, and the two began living together the following month. Shortly afterwards, the two and a third person, Mark Walter, decided to go to Florida. Petitioner took a .357 Magnum from her father's gun collection at Remeta's instance.

During the trio's drive to Florida, petitioner learned of the extent of Remeta's prior prison record and, following an argument, told Remeta she should return home. Remeta then threatened to harm her or her family if she left him. During this trip, Remeta began to play Russian Roulette with petitioner and exerted increasing control over her, selecting her clothes and selling her belongings. Remeta continued his threats against petitioner and her family throughout the trip, warning her that if she attempted to leave him in a public place, he would kill everyone around them. In addition to these threats, Remeta physically and sexually abused petitioner and never left petitioner and Walter alone together. Remeta also retained constant possession of the .357 and fired it intermittently.

Over the next three weeks, the three traveled through several states, arriving in Kansas on or about February 12, 1985. During this period, Remeta apparently committed at least one homicide following a robbery. Petitioner heard this victim beg Remeta for her life and heard the shots fired.

Remeta, Walter, and petitioner spent the night of February 12 at a Wichita motel. On the morning of February 13, they picked up a hitchhiker, James Hunter. Hunter, a resident of Missouri, was attempting to return to the Kansas City area when he accepted this ride. However, Remeta subsequently refused to allow Hunter to leave the group and intimidated him by firing a gun in his direction when the car was stopped. Remeta also told Hunter he had killed a woman by shooting her repeatedly and stated he wished he had killed a hitchhiker picked up by the group earlier.

The crimes in question in this matter occurred on February 13, 1985, and began with the shooting of Thomas County Undersheriff Ben Albright, who pulled over the Remeta vehicle after receiving a radio message from a fellow patrolman asking him to check the car. Immediately after Albright stopped the vehicle, Remeta emerged from the car and shot Albright several times. Albright was critically injured but managed to alert other law enforcement officers with a description of the car and its location. During the time the vehicle was stopped, Hunter attempted to shoot Remeta but accidentally shot petitioner in the hip.

The Remeta vehicle then proceeded to Levant, Kansas, and stopped at a grain elevator. At the elevator, Remeta shot the elevator manager, Maurice Christie, and ordered two men working at the elevator, Glenn Moore and Rick Schroeder, into the back of Moore's pickup truck. The truck then left the elevator, with Walter and petitioner in the cab and Remeta, Hunter, Moore, and Schroeder in the bed. Moore and Schroeder were found dead on a road shortly after this, each having been shot twice.

Law enforcement officers pursued and located the truck, which had stopped near a farmhouse. Officers arrested Remeta, Hunter, and petitioner after a gunfight in which Walter was killed and Remeta and petitioner were injured.

Remeta, Hunter, and petitioner were charged with two counts of felony murder, two counts of aggravated kidnapping, one count of aggravated robbery, one count of aggravated battery on a law enforcement officer, and one count of aggravated battery.

Several weeks prior to trial, petitioner's counsel moved for funds to secure expert services to assist him in developing a defense that petitioner was under the influence and control of Remeta when the crimes were committed. In support of the motion, counsel introduced the testimony of the jail chaplain and proffered the statement of Remeta's psychiatrist that Remeta was both violent and able to exert control over others and the psychiatrist's opinion that counsel should explore the battered woman syndrome, the "Stockholm defense", and the dissociate response in preparing petitioner's defense. Counsel also proffered the testimony of a psychiatrist from the Menninger Foundation that both the battered woman syndrome and the dissociate response were likely applicable to petitioner. The trial court denied the motion, finding this information irrelevant. The trial court also denied a later motion to transport petitioner to Topeka for evaluation.

Counsel renewed the motion for expert services a third time upon receipt of Remeta's prison records, and the trial court again denied the motion.

Before petitioner was tried, Remeta entered a guilty plea to all counts. Petitioner and Hunter were tried together in June 1985 following unsuccessful motions for severance and change of venue, and both were convicted on all counts.[1] Their trial was the first televised trial in the state.

At the trial, witnesses for the state and the defense gave conflicting accounts concerning petitioner's participation in the crimes. Virtually no witness identified petitioner as having a weapon at any time, and Remeta testified he had committed the crimes charged.

Presenting numerous claims, which include those raised in this action, petitioner appealed her conviction to the Kansas Supreme Court, which affirmed in a lengthy opinion. *State v. Dunn*, 243 Kan. 414, 758 P.2d 718 (1988). Petitioner filed the instant application for a writ of habeas corpus in May 1990.

## Discussion
### Change of Venue

Petitioner first claims she was deprived of due process by the trial court's denial of a change of venue. This claim is based on petitioner's assertions she was denied an impartial jury due to the amount of pretrial publicity concerning the crimes and the sense of outrage that permeated the community following the crimes.

In reviewing this claim, the court is mindful that the decision regarding a change of venue lies within the sound discretion of the state court trial judge. Because of the unique position occupied by the trial judge, who has an opportunity to consider the demeanor of prospective jurors, the trial court's decision that jurors

---

1. Hunter's conviction was subsequently reversed by the Kansas Supreme Court in *State v. Hunter*, 241 Kan. 629, 740 P.2d 559 (1987). By the agreement of the parties, Hunter's retrial was conducted in Ellis County, Kansas. Hunter presented a compulsion defense at that trial and was acquitted on all counts in January 1988.

will be capable of disregarding any opinions based on pretrial publicity is entitled to deference. *Patton v. Yount*, 467 U.S. 1025, 1038–39, 104 S.Ct. 2885, 2892–93, 81 L.Ed.2d 847 (1984). *See also United States v. Williams*, 897 F.2d 1034 (10th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991); *Kordenbrock v. Scroggy*, 680 F.Supp. 867 (E.D.Ky.1988), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir.1990) (decision of trial court regarding change of venue entitled to deference on review).

■ The right to jury trial guarantees the criminal defendant "a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). The Constitution does not, however, guarantee a criminal defendant trial by a panel of jurors with no previous knowledge of the issues involved or even jurors with no previous opinions regarding the matter. Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723, 81 S.Ct. at 1643.

In subsequent discussion of this standard, the Supreme Court has repeated its caution that assurances by prospective jurors of such impartiality are not dispositive. Instead, "[i]t remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975), *quoting Irvin*, 366 U.S. at 723, 81 S.Ct. at 1643.

■ It is uncontroverted in this case that there was considerable pretrial publicity involving the crimes, the crime spree that preceded the crimes in Thomas County, the cost of the proceedings, and the petitions regarding the death penalty that circulated within the community shortly after the crimes. This court has also viewed a televised interview with Remeta, aired locally, in which he acknowledged his commission of the crimes and expressed no remorse. Certainly, it must be conceded these pre-

sentations could have done nothing to assuage the shock and anger within the community.

It must also be noted, however, that the materials in question were factual in nature and not inflammatory. The representations made regarding petitioner, specifically, that she had been an honor student and that she had no previous criminal record, are accurate and not derogatory. Further, the statements made regarding petitioner by Remeta during his interview exonerated petitioner of any involvement in the crimes.

Jury selection for petitioner's trial lasted one and one-half days. A panel of 143 prospective jurors was assembled for the trial. Of this group, 39 were excused for cause, 51 were dismissed on peremptory challenges, and 39 were excused from service.

This court has reviewed the transcript of the voir dire and finds the examination of the prospective jurors was even-handed and thorough. None of the persons selected for the jury expressed any close relationship to any of the victims or other participants in the trial proceedings, and none acknowledged any firm opinion concerning the case stemming from the pretrial publicity. While five of the twelve persons selected for the jury were acquainted with one or more of the victims, such a circumstance is not surprising given the rural setting.

■ Having examined the record in light of petitioner's claims and in light of the circumstances at the time of the trial court's ruling, the court finds the decision of the trial judge regarding the change of venue was a proper exercise of his discretion. Although the pretrial publicity in this case was substantial, the mere quantity of pretrial publicity does not alone deny a criminal defendant of a fair trial. *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). Further, this court has concluded the material regarding petitioner was essentially accurate. *See Murphy*, 421 U.S. 794, 801 n. 4, 95 S.Ct. 2031, 2036 n. 4 (noting importance of distinction between factual and inflammatory

publicity). Viewing the record as a whole, this court concludes the defendant has not shown that such prejudice existed in Thomas County that an impartial jury could not be impanelled. Therefore, petitioner is entitled to no relief on this claim.

The court's ruling on this issue should not be read as condoning broadly the extensive media coverage that surrounded petitioner's trial. Because the court concludes petitioner is entitled to relief on her remaining claims, this opinion need not belabor the potential for a circus atmosphere created by the extensive media attention focused on petitioner's trial. Nonetheless, an examination of the record gives the court great concern regarding the practice of allowing cameras in the courtroom. This court can express only trepidation regarding the prospect of future televised trial proceedings and the "gavel-to-gavel" contemporaneous television coverage such as that which accompanied petitioner's trial.[2] Having viewed film of the televised commentary that was carried locally throughout petitioner's trial, this court is constrained to conclude there is no reasonable possibility of now impanelling an impartial jury in Thomas County. Accordingly, while the court affirms the original decision of the trial judge, it concludes that the new trial granted elsewhere in this decision must be conducted outside Thomas County.

Denial of Expert Services

■ Petitioner next asserts her motion for funds for expert services was improperly denied by the trial court.

It is fundamental that an indigent criminal defendant must be provided a fair opportunity to present his defense. The United States Supreme Court has recognized that, where a defendant's mental condition is of critical importance, the state is required to provide the defendant with access to psychiatric assistance in evaluating and preparing a defense. *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

Consistent with this principle, the State of Kansas provides for expert services when such assistance is necessary and beyond the financial means of the defendant. K.S.A. 22–4508.

The issue before this court is whether petitioner made a sufficient showing to the trial court that her mental condition at the time of the crimes would be a significant factor during her trial such that the court's refusal to provide funds for services was a deprivation of due process.

In this circuit, to establish that a defendant's mental condition will be a significant issue at trial, the defendant must make a showing that is "clear and genuine, one that constitutes a 'close' question which may well be decided one way or the other." *Cartwright v. Maynard,* 802 F.2d 1203, 1211 (10th Cir.1986), *citing United States v. Sloan,* 776 F.2d 926 (10th Cir.1985). The court finds there was compelling evidence before the trial court that petitioner's mental condition would be a significant issue at trial and concludes the trial court erred in refusing to grant the motion for expert services. In reaching this conclusion, the court has carefully considered both the evidence presented to the trial court and the expert testimony offered at the evidentiary hearing in this matter.

The evidence presented to the trial court described in general terms the nature of the physical abuse and threats to petitioner and her family made by Remeta after the two left Michigan, the fact that Remeta had an extensive, violent criminal history and prison record, and Remeta's own admissions of his threats to petitioner. Counsel also related to the court his conversations with a Michigan psychologist who treated Remeta during his incarceration and verified his proclivity for violence and counsel's conversations with Dr. William Logan, a forensic psychiatrist from the Menninger Foundation. The trial court was aware that both these professionals advised petitioner's counsel to investigate the battered woman syndrome and the dis-

---

**2.** The "gavel-to-gavel" coverage broadcast by a local television station involved commentary by a former prosecuting attorney who was retained

by the station as a legal expert and his responses to questions called in by local residents.

sociative response, and counsel pointed out he was not personally qualified to develop such a defense. Counsel also provided the court with estimated costs of the services and outlined the nature of the compulsion defense he expected to develop with the expert's assistance. This showing was thorough and ample to establish the requisite close question regarding the defendant's mental condition. Indeed, given the lack of funds, it is difficult to imagine what additional evidence counsel for petitioner reasonably might have presented in support of his motion in the absence of the very assistance he sought.

In addition to the lower court record, this court has had the benefit of the expert testimony of Dr. Marilyn Hutchinson, a psychologist specializing in work with the survivors of trauma. Dr. Hutchinson testified regarding her contacts with petitioner and her professional assessment of petitioner's mental responses to the events surrounding her association with Remeta. Dr. Hutchinson described petitioner as a very bright but emotionally immature young woman with a dependent personality. She further testified of her impression that, as a result of isolation and Remeta's abuse, including threats, physical and sexual abuse, and sleep and food deprivation, petitioner was emotionally overwhelmed and developed a dissociative response during her affiliation with him. According to Dr. Hutchinson, the result of such a response was a feeling of numbness and inertia with a corresponding diminution of petitioner's judgment and problem-solving faculties. This sense of inertia, in turn, according to Dr. Hutchinson, would have prevented petitioner from recognizing opportunities for escape from her circumstances or from objectively assessing her ability to escape; it is this sense of inertia, not simply petitioner's intellect, which properly should be considered by the jury in evaluating whether petitioner had the requisite intent to participate in the crimes of which she was charged.

An understanding of petitioner's perception of her ability to escape was, of course,

pivotal to whether a compulsion defense was appropriate in her trial, as this defense is available only to a defendant who had no reasonable opportunity to escape from continuous coercion and avoid committing a crime. *See State v. Myers*, 233 Kan. 611, 664 P.2d 834 (1983). Having considered the arguments and testimony offered at the evidentiary hearing in this matter, the court is persuaded that a lay jury would require expert testimony to appreciate petitioner's mental condition; its concomitant aspects of inertia, the response of compliance, and the perception of impending violence; and, ultimately, its impact on her ability to remove herself from the company of Remeta. Therefore, the court concludes petitioner should have been afforded access to expert services in order to effectively present her defense and finds the failure to provide such services resulted in a denial of due process.

Instruction on Compulsion

■ The final issue before the court in this action is petitioner's claim that the trial court erred in denying her request for a jury instruction on the defense of compulsion. Petitioner made a timely request for the compulsion instruction pursuant to K.S.A. 21–3209. The trial court rejected this request on the ground the defense was not available in cases of felony murder. On direct appeal, the Kansas Supreme Court noted this ruling was incorrect, citing its holding in Hunter's appeal[3] that the compulsion defense is available when the defendant is charged with felony murder. The court, however, upheld the trial court's refusal to instruct on compulsion based on its conclusions that petitioner had a reasonable opportunity to escape Remeta and that any coercion was not continuous.

It is well-settled that a criminal defendant is entitled to have the jury instructed on any theory supported by the evidence and the law. *United States v. Scafe*, 822 F.2d 928, 932 (10th Cir.1987); *United States v. Lofton*, 776 F.2d 918, 919–20 (10th Cir.1985). After considering the record, this court finds the testimony at trial included information that the jury rea-

---

**3.** *See State v. Hunter*, 241 Kan. 629, 642, 740 P.2d 559, 567 (1987).

sonably might have found compatible with the compulsion defense and concludes there was sufficient evidence to present a triable issue of fact.

The evidence before the jury included testimony that both petitioner and Hunter were threatened repeatedly by Remeta, that they feared Remeta, and that Remeta was in constant possession of a loaded firearm. Petitioner had been brutally abused by Remeta for a period of over two weeks. There can be little doubt that Remeta was capable of ruthless, violent behavior, and the jury could reasonably have concluded that the fear to which both petitioner and Hunter testified was well-grounded. Further, Remeta testified that petitioner had no choice regarding her whereabouts and affirmed that he would have carried out his threats had she attempted to escape.

This conclusion also finds support in the court's determination that petitioner's mental condition was a significant issue in her defense and that the jury would need expert testimony to adequately understand this theory. With the benefit of expert testimony, such as that heard by this court, a reasonable jury could conclude that petitioner's perception of her opportunities to escape was altered by her emotional response to her circumstances and that the environment in which she existed was one of continuous terror.

### Conclusion

For the foregoing reasons, it is this court's conclusion that petitioner is entitled to a new trial with the assistance of an expert in the preparation and presentation of her defense and with an opportunity to present the compulsion defense to the trier of fact.

IT IS THEREFORE ORDERED that a writ of habeas corpus shall be conditionally issued. Petitioner shall be released from custody unless, within 120 days of the issuance of this order, a new trial is commenced.

IT IS FURTHER ORDERED that the new trial shall be conducted outside Thom-as County in a county to be agreed upon by counsel in the criminal action. In the event counsel are unable to agree upon a location for the new trial, they may petition this court for designation of a trial site.