No. 65,869

STATE OF KANSAS, *Appellee*, v. SEDRICK SCOTT, *Appellant.*

(827 P.2d 733)

Opinion filed February 28, 1992.

*Rebecca E. Woodman*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with her on the brief for appellant.

*Debra Byrd Wagner*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by Sedrick Scott from his convictions of two counts of aggravated battery, one count of aggravated assault, and one count of aggravated kidnapping.

Scott contends the State relied on a single and continuing act of force to form the basis of the aggravated assault and aggravated kidnapping charges. Scott also contends the trial court erred in refusing to give a requested instruction on compulsion and an additional aiding and abetting instruction. In addition, he claims the evidence is insufficient to support his conviction of aggravated kidnapping.

On September 7, 1989, the victim, 14-year-old Charles Green, discussed selling drugs with LaMacey Woods. Woods was charged

with several crimes arising out of these incidents, and his convictions were affirmed in *State v. Woods*, 250 Kan. 109, 825 P.2d 514 (1992). Woods gave Green $80 worth of crack cocaine, which green agreed to sell and then to give the proceeds from the sale to Woods. Green sold the cocaine and brought the money back to Woods. Woods then gave Green $40 worth of cocaine to sell. Green returned to his sister's house.

About one hour later, someone came over to Green's sister's home and told Green that Woods wanted to see him. Green voluntarily returned to Woods' house across the street. Woods and a man named Phil were outside working on Phil's car. Green voluntarily went into Woods' house with Woods and Phil. Woods directed Green to take a seat in the living room. There were several other people in the house, including Scott.

Woods inquired about the money from the cocaine Green was supposed to sell. Green explained he had not yet sold the cocaine and gave it to Woods. Woods told Green that this cocaine was not the cocaine he had given Green and that Green had "messed up his money." Scott did not say anything while this was transpiring.

Green complied with Woods' order for Green to follow Woods into a back room. Scott, Phil, and another man followed Green into the room. In the back room, Woods began loading and unloading a gun. Scott, Phil, and the other man started hitting Green. Everyone in the room said he was going to kill Green. Green testified that Woods and Phil told Scott to hit Green and that this was the only occasion Scott hit him. At Woods' direction, Scott tied Green's hands behind his back with a bathrobe belt, and the men continued beating and kicking Green. Although no one directed him to do so, Scott took off Green's shirt. Scott told Green to lie on his back, and then, upon Woods' direction, told Green to turn over. After Woods burned Green's back with a clothes iron, someone poured salt on the wound. Scott cut Green's arm with a razor blade; Phil then took the razor from Scott and said he would show Scott how to do it. Again, someone poured salt on the wound. Scott and the others continued hitting Green.

After someone put a gun to Green's head to get him to stand up, Woods took Green into the bathroom and made him stand

in a bathtub filled with water. Woods attempted to electrocute Green by dropping a curling iron into the water, but the cord was not long enough. Scott did not have anything to do with the attempted electrocution.

Woods then took Green back to the back room and shocked his feet with an extension cord. The extension cord was plugged into a wall outlet, and pieces of clothes hangers were plugged into the outlets on the cord. Scott did not participate. Green testified that Scott stood in the doorway and looked surprised.

Green again was beaten and then taken to the living room. Woods told Green he was now part of their "family" and could not go back home. Woods told Scott that Green was now Scott's "man" or "shadow." Green was directed to do whatever Scott told him to do. Woods told Scott to take Green with him to sell drugs.

Scott allowed Green to run across the street to his sister's house for a few minutes. Green's sister wanted to call the police, but Green told her not to because Woods and others present had stated that if Green told the police, they would kill him. Green was not sure whether Scott had participated in his verbal terrorizing.

Scott then took Green to a club where he bought Green a sandwich and a drink. When Green finished eating, Scott was gone. Green went home and the next day went to the hospital. He did not tell the police the truth about how he received his injuries.

On cross-examination, Green admitted that on the evening of September 7, he voluntarily returned to Woods' house to see if Scott was there. Scott was not. Woods gave Green $200 worth of cocaine and said he would see Green in the morning.

On September 11, 1989, Green was at a club with friends. Around 6:30 or 7:00 p.m., Scott came into the club, put a .25 automatic into Green's side, and told him that Woods was waiting for him outside. Green testified that Woods had sent Scott into the club to summon him.

Woods, who was standing by the door, put his arm around Green and said, "Let's go." Woods walked Green to Woods' car. Woods drove the car. A man Green did not know was also in the front seat. Green, Scott, and another man with whom Green

was not acquainted sat in the back seat. Green was sitting behind Woods with Scott to Green's immediate right. Green testified that Scott still had the gun, but that Green could not see it. Green also testified that nothing prevented Scott from shooting or "doing anything" to Woods.

Woods drove back to his house, parked the car in the back yard, and told the others to wait in the car. Green testified there was nothing that stopped Scott from getting out of the car and leaving. Green did not get out of the car and leave because Scott was sitting next to him with the gun.

Woods returned to the car and ordered everyone out. They walked to the front of the house, with Woods leading the way. Green followed Woods and Scott was behind Green. Phil, who had been present for the September 7 attack, was waiting and, when Green walked by, started beating him with a pole.

Once inside the house, Woods, Scott, and another man took Green to the back room. Woods and possibly others told Green they were going to kill him this time. Green testified that Scott did not make such a statement.

On direct examination, Green testified that Woods was not in the room when Scott tied Green's hands behind his back and ripped off Green's shirt. Woods returned with a clothes iron and burned Green on his chest and stomach. The other man stabbed Green with a knife. Woods shocked Green with the extension cord device. Scott was "[j]ust standing around watching." Woods then started beating Green's legs with a sawed-off .12 gauge shotgun. People were yelling, "Break his legs."

On cross-examination, Green testified that upon going to the back room, a man called Val started punching him. Woods returned with a .38 revolver and played Russian roulette with Green. Woods pulled the trigger four or five times with the weapon pointed at Green's head and then fired the final bullet into the floor. Green testified that Scott appeared to be frightened of Woods while this was happening. Woods then unloaded a sawed-off shotgun and started hitting Green with the butt of the gun. The record is not clear, but it appears Scott was not present all the time, having left the room during part of the torture.

Woods then took Green outside. Scott and others were present. They made Green take off all of his clothing. Phil hit Green in

the eye with the butt of a gun. They locked Green in the car trunk. Later, Scott checked on Green to see if he was okay. Green told Scott he was cold. About an hour later, Scott returned with clothing and food. Green testified that Scott appeared to be concerned and was the only one trying to help him.

Woods finally came out and released Green from the trunk about 2:30 a.m. Woods drove Green to a hospital, but did not stop because police were in the vicinity. Woods took Green to a motel and told him someone would pick him up in the morning. When no one came to pick him up, Green called his uncle, who took him to the hospital. Green spent six days in the hospital.

### 1. Multiplicity

Scott claims that the State, in its opening and closing arguments, relied upon Scott putting a gun to Green's side on September 11, 1989, to support his convictions of aggravated kidnapping (count three) and aggravated assault (count four). Scott maintains that because the State relied upon this single and continuing act of force to support both charges, his convictions on counts three and four are multiplicitous.

The record does not support the argument that the State only relied upon Scott putting a gun to Green's side to support the aggravated kidnapping charge.

In opening argument, the prosecutor stated:

"Count three [aggravated kidnapping] is an allegation that on the 11th day of September this defendant once again took Charles Green and confined him with the intent to terrorize him and with the intent to do bodily harm. Count four is the crime of aggravated assault where this defendant took a .25 caliber automatic hand gun and advised this defendant [sic] that he was to come with him or he was going to be shot."

In closing argument, the prosecutor stated:

"[A] couple of days later on the 11th of September [Green] was down on 9th Street in one of the clubs down there. He testified and told us that this defendant came in to that club and produced what he felt was a .25 caliber automatic pistol, stuck it in his side and said [Woods] wants to see you outside and forced him out of that club.

"[Green] testified and told us that the defendant had the gun and forced him over to a car where LaMacey Woods was waiting and they all got in the car. This defendant was in the back seat with him still with the gun in his hand. [Green] testified and told us that they drove him back to this house on Minneapolis . . . at that time took him back into the house . . . ."

"He testified that all of the individuals that were there, including this defendant and LaMacey Woods, then had him go back to the back bedroom. Once again this defendant tied his hands, once again this defendant removed his shirt and once again LaMacey Woods started doing his feet. [Green] testified that this time Wood[s] burned him on the chest . . . .

"[Green] testified and told us that he was also stabbed several times in both arms, in his right arm and in his left arm. He indicated he also received a wound to his hand. He testified and told us that there was water placed in the bathtub, that Woods was going to drop an electric item, a curling iron or something into the water and shock him or electrocute him but the cord wasn't long enough. But once again, he was shocked on the bottom of the feet with the electrical cord."

After the prosecution rested, defense counsel argued that the court should dismiss count four:

"I would suggest to the Court that [count four] merges with count three . . . . The State is alleging that my client took the gun and pointed it at Mr. Green to get him out of the club, which is exactly, minus one element, the same elements and crime as contained in count three of aggravated kidnapping. I would argue that that is duplicitous, because it's the same act being charged as two separate crimes, the aggravated kidnapping and the aggravated assault."

In response, the prosecutor argued that assault and kidnapping were two separate acts, distinct from each other. The court overruled the defendant's motion.

The State did not rely upon a single act of force. However, even if the State had relied upon a single act of force in its arguments to the jury, opening and closing arguments are not evidence. See *State v. Brown*, 181 Kan. 375, 394, 312 P.2d 832 (1957). Here, the issue is not the content of the State's arguments, but whether the evidence supports a finding that the same act constituted the force element for both crimes.

In *State v. Woods*, 250 Kan. 109, 119-20, 825 P.2d 514 (1992), we stated:

" 'Multiplicity exists when the State uses "a single wrongful act as the basis for multiple charges." [Citation omitted.] Charges are not multiplicitous if each charge requires proof of a fact not required in proving the other. [Citation omitted.] . . . Offenses are also not multiplicitous when they occur at different times and different places, because they cannot then be said to arise out of a single wrongful act.' *State v. Howard*, 243 Kan. 699, 703, 763 P.2d 607 (1988).

See *State v. Zamora*, 247 Kan. 684, 694, 803 P.2d 568 (1990) ('Where offenses are committed separately and severally at different times and at

difference places, they cannot be said to arise out of a single wrongful act.'); *State v. Garnes*, 229 Kan. 368, 373, 624 P.2d 448 (1981) (same); *Wagner v. Edmondson*, 178 Kan. 554, 556, 290 P.2d 98 (1955) ('[T]he test for determining whether a continuous transaction results in the commission of but a single offense . . . is determined by whether separate and distinct prohibited acts, made punishable by law, have been committed.'); see also *Davis v. State*, 210 Kan. 709, 713, 504 P.2d 617 (1972) ('[A] single motive for a series of acts does not necessarily result in a single crime.').

"Multiplicity in the crimes charged exists if the crimes charged are based on 'a series of violent acts occur[ring] simultaneously.' *State v. Cathey*, 241 Kan. 715, 720, 741 P.2d 738 (1987); see *State v. Smith*, 245 Kan. 381, 392, 781 P.2d 666 (1989). This court has found offenses multiplicitous if the 'defendant's conduct constituted a single continuous transaction' or 'one continuing unbroken act of force.' *State v. Bishop*, 240 Kan. 647, 653-54, 732 P.2d 765 (1987).

. . . .

"Multiplicity does *not* exist if an act of violence is intermittent or separate and wholly unrelated to the other acts of violence. *State v. Bourne*, 233 Kan. 166, 168, 660 P.2d 565 (1983). If there is a 'break in the action' or if 'offenses occurred at separate times and in separate places,' the charges are not multiplicitous. *Bishop*, 240 Kan. at 653-54; see *State v. James*, 216 Kan. 235, 531 P.2d 70 (1975)."

The crimes committed by Scott were separated by time and distance and were not a part of a common scheme, such as carrying out a sexual assault, a robbery, or an attempted murder. As in *Woods*, the defendant in this case intended to, and did, participate in separate crimes. The State did not rely on a single and continuing act of force to form the basis of both aggravated assault and aggravated kidnapping.

## 2. Compulsion Defense

Scott argues that all acts in which he participated on September 7 and 11, 1989, were because he was terrorized by and in fear of Woods. Scott did not testify, but based upon Green's testimony, Scott maintains the trial court should have instructed the jury on the defense of compulsion.

"In a criminal action, a trial court must instruct the jury on the law applicable to the theories of all parties where there is supporting evidence. When considering the refusal of a trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction." *State v. Burgess*, 245 Kan. 481, Syl. ¶ 1, 781 P.2d 694 (1989).

The defense of compulsion is governed by K.S.A. 21-3209, which provides:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

The Judicial Council's comment to K.S.A. 21-3209(2) specifies that "[s]ubsection (2) creates an exception for the person who connects himself with criminal activities or is otherwise indifferent to known risk."

In *State v. Hunter*, 241 Kan. 629, Syl. ¶ 10, 740 P.2d 559 (1987), this court discussed application of the compulsion defense:

"In order to constitute the defense of compulsion, the coercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The doctrine of coercion or duress cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm. *State v. Milum*, 213 Kan. 581, 582, 516 P.2d 984 (1973). In addition, the compulsion must be continuous and there must be no reasonable opportunity to escape the compulsion without committing the crime. *State v. Myers*, 233 Kan. 611, 664 P.2d 834 (1983)."

See also *State v. Pichon*, 15 Kan. App. 2d 527, 811 P.2d 517 (1991), *rev. denied* 249 Kan. 778 (1991) (compulsion defense applied to escape from lawful custody).

In his brief, Scott claims Green and he held essentially the same position in the Insanes or Crips organization. Scott suggests the only difference is that he was already a member of the group, whereas Green was still in the recruitment state. Scott argues Woods

"ruled his underlings in a way that made them totally dependent upon him for their needs. [Woods] required his recruits to hand over to him all proceeds from the cocaine they sold so they could in Woods' words, 'work up enough money.' [Woods] provided motel rooms where they spent most of their nights. They [were not] allowed to see their own families once they became a member of [Woods'] 'family.' [Woods] punished those who did

not follow his orders. . . . [Y]oung men like [Scott] and [Green] were induced, through financial and emotional dependence, and most importantly, through fear, to do exactly what [Woods] ordered them to do. . . . This financial and emotional dependency upon and fear of Macey Woods, once established, rendered any conceivable opportunity to escape from his grasp quite unlikely."

Green testified that Woods told people what to do and that he punished people who did not act accordingly. Scott's argument that Woods required his recruits to hand over all proceeds, that he provided motel rooms for all, and that they were not allowed to see their own families once they joined his "family" pertains to Green's testimony about what happened specifically to him. Although Green stated that Scott stayed mainly in motels, Green did not testify that Woods provided a motel room for Scott.

Regardless of the veracity of Scott's argument that he and others were emotionally and financially dependent upon Woods, Green's testimony does not support the argument. Green's testimony does not support the contentions that Scott was suffering present, imminent, or impending coercion or duress, that Woods' intimidation of Scott was continual, or that Scott had a reasonable apprehension of death or serious bodily injury if he did not participate in the attacks upon Green. There is evidence that Scott had a reasonable opportunity to escape. After the September 7 attack, Scott took Green to a club; Woods remained at his house. Scott did not live at Woods' house. Scott had his own car. Nonetheless, Scott returned with Woods to the club on September 11. Although Green testified Woods told Scott to summon Green, there is no evidence that Woods told or forced Scott to pull the gun on Green.

It appears Scott and Woods often went their separate ways. In *State v. Dunn*, 243 Kan. 414, 422, 758 P.2d 718 (1988), this court ruled that if the intimidation is not continuous and if there is a reasonable opportunity to escape, the defendant cannot claim he "was compelled to be present when the crimes were committed."

The only witness called on Scott's behalf was Woods. Woods' testimony consisted of his name, the fact he had been residing for two weeks at the Sedgwick County Detention Facility for a crime he allegedly committed, and the fact he had been extradited from California to face charges. Scott did not testify.

Scott contends the prosecutor "took advantage of the absence of an instruction on the compulsion defense and misled the jury." The main thrust of defense counsel's closing argument was that Scott's alleged acts were neither voluntary nor intentional. In response, the prosecutor argued that "counsel for the defendant is appealing to your sympathies. The Court says nothing in here whatsoever about any defense for a criminal action being that someone else made me do it. . . . That's not a defense to a criminal action."

The State argues the prosecutor's remarks were simply a reminder that the jury was obligated to follow the trial court's instructions. Furthermore, according to the State, the jury was not misled because the court previously had ruled that the compulsion defense was not available to Scott.

Scott also claims the need for a compulsion instruction was evidenced by the jury's request for a read-back of "the testimonial evidence by Charles Green pertaining to the fear of [Woods] possessed by Sedrick Scott." Mere fear will not support a compulsion defense instruction.

Additionally, Scott knowingly associated himself with the selling of drugs, á criminal activity, and with a gang noted for violence. The trial court did not err in refusing to give an instruction on the defense of compulsion.

### 3. Association with Principals

The trial court gave the following instruction on responsibility for the crimes of another:

"A person who, either before or during its commission, intentionally aids, abets, advises or counsels another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

See PIK Crim. 2d 54.05; K.S.A. 21-3205(1).

(The only differences between the instruction given and the PIK instruction is the omission of the words "hires" and "procures" before and after, respectively, the word "counsels.")

The trial court denied Scott's request that the following instruction also be given: "Mere association with principals who actually commit the crime or the mere presence in the vicinity of [the]

crime are themselves insufficient to establish guilt as [an] aider and abettor."

Although Scott admits there is no PIK instruction embodying his requested instruction, he argues that his requested instruction is based on a well-settled principle of law. Furthermore, the defendant claims the lack of this instruction impeded the jury in performing its duties to the best of its abilities. Scott argues that if the jury had received this instruction, it reasonably could have inferred that Scott did not "intentionally aid and abet in the commission of the crimes charged against him."

In *State v. Hunter,* this court addressed the same issue raised by Scott and stated:

"Although [this court has] held that mere association with principals is not sufficient to establish guilt as an aider and abettor, [we have not] mandated the giving of such an instruction. . . . [We have] held that the PIK [Crim. 2d 54.05] instruction given clearly informed the jury that intentional acts by a defendant must be proved to convict for aiding and abetting and, thus, proof of mere association or presence would be insufficient to convict. Therefore, the refusal to give defendant's requested instruction was not error." 241 Kan. at 639.

See also *State v. Crabtree,* 248 Kan. 33, Syl. ¶ 6, 805 P.2d 1 (1991) ("Error cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused."). The trial court did not err in refusing to give the requested instruction.

### 4. Sufficiency of Evidence.

Scott argues that the State relied upon an aiding and abetting theory to convict him of aggravated kidnapping and that in order for a jury to convict him of aggravated kidnapping pursuant to an aiding and abetting theory, the jury had to find that at the time Scott committed the aggravated assault upon Green, Scott shared the intent of Woods and others to inflict bodily harm upon Green. Scott claims there was no evidence to this effect.

Our scope of review is:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty

beyond a reasonable doubt." *State v. Dunn*, 249 Kan. 488, Syl. ¶ 1, 820 P.2d 412 (1991).

To convict Scott of aggravated kidnapping, the jury had to find that Scott held Green with the intent to inflict bodily harm or to terrorize. Under the aiding and abetting theory, Scott was criminally liable for the crime of aggravated kidnapping if he intentionally aided, abetted, advised, or counseled another to commit the crime.

" 'It is the rule in this state that mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime are themselves insufficient to establish guilt as an aider and abettor; however, when a person knowingly associates himself with the unlawful venture and participates in a way which indicates he willfully is furthering the success of the venture, such evidence of guilt is sufficient to go to the jury.' " *State v. Buckland*, 245 Kan. 132, 140, 777 P.2d 745 (1989) (quoting *State v. Burton*, 235 Kan. 472, 477, 681 P.2d 646 [1984]).

" 'Intent is a state of mind existing at the time a person commits an offense and it may be shown by acts, circumstances and inferences deducible therefrom.' [Citations omitted.]" *State v. Royal*, 234 Kan. 218, 225, 670 P.2d 1337 (1983). A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Hupp*, 248 Kan. 644, Syl. ¶ 5, 809 P.2d 1207 (1991).

A jury could find that Scott committed aggravated kidnapping based upon the following facts: When Woods drove the car back to his house, Green, Scott, and a man with whom Green was not acquainted sat in the back seat. Green was sitting behind Woods with Scott to Green's immediate right. Green testified that Scott still had the gun. When asked what Scott was doing with the gun, Green stated, "I don't know, I didn't see." When they arrived at the house, Woods told everyone to wait in the car. Green testified that he did not get out of the car and leave because Scott was sitting next to him with the gun. Woods returned to the car and ordered everyone out. Woods led the way, followed by Green who was followed by Scott. Phil, who had been present for the September 7 attack, was waiting and, when Green walked by, started beating him with a pole. Scott and others took Green to the back room. Scott tied Green's hands behind his back and took or ripped off Green's shirt. Green was

then beaten, burned with an iron, stabbed with a knife, shocked with an extension cord device, and forced to play Russian roulette.

A jury also could find that Scott knowingly associated himself with the unlawful venture and that Scott's participation indicated he willfully furthered the success of the venture. The jury could take into account that Scott participated in the September 7 attack upon Green. A jury could infer that Scott could have disassociated himself from Woods and the crimes perpetrated upon Green because Scott had his own vehicle and gun. Furthermore, Scott was not consistently in the company of Woods; thus, Scott had ample opportunities to escape or to contact the authorities.

Scott argues Green's testimony that Scott appeared frightened or shocked and that Scott appeared concerned negates any inference of criminal intent. The jury heard the evidence and came to an opposite conclusion, as was the jury's prerogative.

There is sufficient evidence to support Scott's conviction of aggravated kidnapping.

Affirmed.