(944 P.2d 164)
No. 75,700

STATE OF KANSAS, *Appellee*, v. JOHN E. GUEBARA, *Appellant*.

Opinion filed August 15, 1997.

*Ezra Ginzburg* and *Alice A. Craig*, assistant appellate defenders, and *Steven R. Zinn*, deputy appellate defender, for appellant.

*Scott M. Schultz*, assistant county attorney, *John P. Wheeler, Jr.*, county attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before RULON, P.J., WAHL, S.J., and RICHARD M. SMITH, District Judge, assigned.

WAHL, J.: John E. Guebara appeals from his convictions, after a jury trial, for aggravated battery and failure to stop and remain at the scene of a personal injury accident.

Guebara was caught in a line of traffic at a construction site at the intersection of Highway 50 and Farmland Road in Finney

County. The line of cars was waiting for a pilot car to return and escort them through the construction site. Guebara decided he did not want to wait and moved into the turn lane intending to take a left turn on Farmland Road. Randie Whitt, the flag person on duty, stepped in front of the line of traffic to stop Guebara's minivan. Guebara stopped.

As might well be anticipated, the testimony is conflicting. Guebara testified that Whitt was screaming at him, waving a stop sign which she was carrying, and hit his minivan with the sign. Whitt and Guebara exchanged profanities. Whitt asked someone else at the scene to record Guebara's tag number. Guebara got out of his car and told the man to go ahead and record the tag number because he had done nothing illegal. Guebara returned to his vehicle at about the time the pilot car was ready to lead the eastbound traffic through the construction. Guebara testified that he believed Whitt wanted him to get back in line. Since he was already at the front of the line, he swerved in front of the line and followed the pilot car.

Guebara testified that Whitt was standing about 6 to 8 feet away from the minivan and to his left. He testified that he veered to his right to get back into the line without hitting Whitt and without any intention of hitting her.

Steve Ramos, a passenger in Guebara's minivan during the incident, testified that when Guebara returned to the minivan, Whitt was standing in front of the vehicle on the driver's side. Ramos testified that, as Guebara began to follow the pilot car, Whitt hit the minivan with the sign and her fists. Ramos did not see the minivan hit Whitt. Neither did he see Guebara attempt to steer the van in her direction.

Andy Guebara, the defendant's son, was also a passenger in the minivan. From his position in the middle seat, he saw Whitt run toward the car and hit it with either her hand or the stop sign. Andy testified that Guebara stopped after Whitt hit the minivan. Andy did not recall Guebara's getting out of the minivan during the incident, but he testified that, as Guebara began to follow the pilot car, Whitt struck the vehicle again with the sign. Andy did not see Whitt fall to the ground.

Whitt testified that she did not see a turn signal activated on Guebara's minivan. She told Guebara to get back into line and go through the construction site, intending for him to move to the front of the line and follow the pilot car. Whitt testified that, as Guebara began to follow the pilot car, she attempted to move out of the way, but he veered toward her. She testified that the front bumper of the minivan hit her left leg. She testified that she fell to one knee after being hit. Whitt testified that after being hit, she struck the minivan with her fist and with the stop sign.

Mike Hiner, the co-worker Whitt asked to record Guebara's tag number, testified that he had a brief exchange with Guebara before Guebara got back into the minivan. Hiner testified that after the pilot car turned around, he saw Guebara pull forward before he was supposed to, and Whitt stepped in front of the minivan to stop him. Hiner testified that he heard a "large thumping sound," and saw the minivan collide with Whitt. After this, Hiner saw Whitt step back and grab her knee.

Billy Hawk, driver of the pilot car, also witnessed the incident. Hawk testified that he saw Guebara attempt to pull into the line of traffic and Whitt stepped in front of Guebara's minivan. Hawk saw the minivan hit Whitt on the leg. He then saw Whitt hit the minivan with her sign.

Guebara complains that the district court erred in declining to instruct the jury on the lesser included offense of battery.

"The defendant has a right to have the court instruct the jury on all lesser included offenses established by substantial evidence, however weak, unsatisfactory, or inconclusive the evidence may appear to the court. Even the unsupported testimony of the defendant alone, if tending to establish such lesser offense, is sufficient to require the court to so instruct. However, the evidence must be substantial and there must be evidence which, when viewed in a light most favorable to the defendant, would justify a jury finding in accordance with the defendant's theory." *State v. Harmon*, 254 Kan. 87, Syl. ¶ 1, 865 P.2d 1011 (1993).

Guebara was charged with aggravated battery pursuant to K.S.A. 21-3414(a)(2)(B), which prohibits "recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A.

21-3412(a) defines simple battery as "[i]ntentionally or recklessly causing bodily harm to another person."

Defense counsel requested that during the instructions conference the simple battery instruction be given. The trial court refused to give this instruction, relying upon *State v. Manzanares*, 19 Kan. App. 2d 214, 866 P.2d 1083 (1994).

*Manzanares* involved a high-speed automobile chase. After an argument, the defendant in his van chased his estranged wife's car at speeds of 50 to 60 miles per hour. During the chase, the defendant's van struck the victim's car from the rear at least once, and he then rammed his van into the side of her car. After a jury trial, Manzanares was convicted of aggravated battery and reckless driving. On appeal, Manzanares argued that the district court erred in failing to instruct the jury on battery as a lesser included offense of aggravated battery. A part of his argument was that the jury could have found that his van was not a deadly weapon. A panel of this court ruled that the district court had properly put the question of whether the van was a deadly weapon to the jury. The panel went on to note that had the jury determined the van was not a deadly weapon, Manzanares would have been found not guilty. 19 Kan. App. 2d at 219.

*Manzanares* was decided under a different statutory scheme and is factually distinguishable from the case before us. Also, the use of the van in *Manzanares* was much more violent and reckless than defendant's use of the van here. To the extent, however, that *Manzanares* can be read to hold that battery is not a lesser included offense of aggravated battery, we disapprove that interpretation.

The jury could have found, under the facts of this case, that the minivan was not used as a deadly weapon. Nevertheless, it still could have found that Guebara recklessly or intentionally caused bodily harm to Whitt, thus supplying the necessary elements of battery. The State argues that Guebara's only defense at trial was that nothing had happened. While this may be true, the evidence presented by the State would be sufficient to convict Guebara of simple battery if the jury found that the minivan was not used as a deadly weapon in this situation.

Under K.S.A. 21-3412, unlike the battery statute applicable in *Manzanares*, reckless conduct resulting in bodily harm to the victim is sufficient to constitute a battery. K.S.A. 21-3414(a)(2)(B) also requires reckless conduct but does not mention intentional conduct.

The court erred in not instructing the jury on simple battery as a lesser included offense of aggravated battery.

Guebara complains that the jury was not properly instructed on the definition of a deadly weapon. Both parties cite case law for the standard of review which provides that refusal of a trial court to give a specific instruction must be viewed in the light most favorable to the requesting party. *State v. Scott*, 250 Kan. 350, Syl. ¶ 4, 827 P.2d 733 (1992); *State v. Hunter*, 241 Kan. 629, 644, 740 P.2d 559 (1987). This standard of review, however, is designed for instructions on all theories supported by evidence. The question before us is simply whether the district court correctly defined "deadly weapon." This is a question of law over which this court's review is unlimited. See *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

The jury was instructed that "[t]he term 'deadly weapon' is defined as a weapon dangerous to life or likely to produce bodily injury from the use made of it or with which death may easily and readily be produced."

This was the instruction given by the trial court in *Manzanares*. 19 Kan. App. 2d at 218. Guebara argues that this instruction was grammatically confusing and created three separate categories for a deadly weapon, two of which are almost per se definitions, causing any weapon dangerous to life to be a deadly weapon despite how it is used.

The Kansas Supreme Court has previously defined "[a] deadly weapon" as "an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury." *State v. Hanks*, 236 Kan. 524, 537, 694 P.2d 407 (1985) (citing Black's Law Dictionary 487 [4th ed. 1968]); see *State v. Adams*, 12 Kan. App. 2d 191, Syl. ¶ 2, 737 P.2d 876 (1987). The Kansas Supreme Court has also ruled that whether a weapon is used as a deadly weapon is a question of fact for the jury. *State v.*

*Colbert*, 244 Kan. 422, 428, 769 P.2d 1168 (1989) (defendant struck the victim on the head with a gun). The *Colbert* court held:

"The size of the weapon, the amount of force used, and the portion of the body contacting the gun are all factors for the trier of fact to consider in making the determination. The mere fact that some contact occurred between the [weapon] and the victim is insufficient to meet the use of a deadly weapon requirement." 244 Kan. at 426-27.

The district court's rationale for using the *Manzanares* instruction rather than the *Hanks* instruction was that the facts of the instant case were more similar to *Manzanares*, and the court deemed the *Manzanares* instruction to be more clear. The *Manzanares* instruction, however, conflicts with established case law. Especially troublesome is that, under the *Manzanares* instruction, the jury could have found the minivan to be a deadly weapon by determining that it was "likely to produce bodily injury from the use made of it." 19 Kan. App. 2d at 218. This definition conflicts with the *Hanks* definition, which requires at least "serious bodily injury." 236 Kan. at 537. Indeed, the instruction given in the instant case necessarily includes all weapons, which would make the use of the word "deadly" in the statute quite irrelevant. Under the rules of statutory construction, "[i]t is presumed the legislature understood the meaning of the words it used and intended to use them." *Bank of Kansas v. Davison*, 253 Kan. 780, 788, 861 P.2d 806 (1993) (quoting *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, Syl. ¶ 8, 834 P.2d 368 [1992]).

The State contends that this court has already approved in *Manzanares* the specific instruction used. The instruction, however, was not challenged in *Manzanares*. If it had been, the instruction would have been ruled error, as this court is bound by precedent of the Kansas Supreme Court. *State v. Horn*, 20 Kan. App. 2d 689, Syl. ¶ 3, 892 P.2d 513, *rev. denied* 257 Kan. 1095 (1995). The definition of "deadly weapon" used by the trial court in its instruction to the jury was overly broad. In this, the court erred. On remand, the *Hanks* definition should be used.

Reversed and remanded for a new trial.