IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,630

STATE OF KANSAS,
*Appellee*,

v.

MATTHEW DOUGLAS HUTTO,
*Appellant*.

SYLLABUS BY THE COURT

1.

Appellate courts generally review a district court's decision to deny a postsentencing motion to withdraw a guilty or no contest plea for abuse of discretion. On appeal, the movant bears the burden to prove the district court erred in denying a motion to withdraw a plea.

2.

Under K.S.A. 2020 Supp. 22-3210(d)(2), after pronouncing sentence, a district court may set aside a judgment of conviction and permit the defendant to withdraw a plea in order to correct manifest injustice.

3.

Compulsion may be used as a defense to felony murder if it is a defense to the underlying felony. In order to assert a compulsion defense, a defendant must show the coercion or duress is present, imminent, and impending at the time of the crime, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done.

1

4.

The doctrine of coercion or duress cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm. Compulsion must be continuous and there must be no reasonable opportunity to escape the compulsion without committing the crime. A threat of future injury is not enough to invoke a compulsion defense. If the intimidation is not continuous and if there is a reasonable opportunity to escape, the defendant cannot claim he was compelled to be present when the crime was committed.

5.

In pursuing a postsentence motion to withdraw a plea, a defendant must show that counsel's performance fell below the standard of reasonableness and that there was a reasonable probability that, but for counsel's errors, the defendant would not have entered the plea and would have insisted on going to trial.

6.

Courts engage in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Opinion filed July 9, 2021. Affirmed.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Matthew Hutto pleaded guilty to two counts of felony first-degree murder. After receiving consecutive hard 25 life sentences, he moved to withdraw his plea. He now appeals from the denial of that motion to withdraw his plea.

FACTS

As of July 20, 2018, Hutto was residing in Greenleaf, Kansas, with Brad Sportsman and Richard Showalter. Also living in the household were Brad's mother—Dema Deiderich—and Larissa Mills and Cole Pingel. Brad Sportsman was married to Lisa Sportsman, but the relationship had deteriorated, and earlier that summer she had left him and moved to Topeka.

Brad was in charge of the household and exercised considerable control over the other residents. For example, he informed them that he was affiliated with an organization called MS-13 and that an individual named "Penny" was the leader of MS-13, an almost entirely Hispanic criminal street gang. Brad showed photographs of a woman who he asserted was Penny, but these photographs turned out to be photographs of United States House of Representatives Speaker Nancy Pelosi, which had been digitally altered to look as if she had MS-13 tattoos on her face and body.

Around July 20, Brad told his mother and others in the group that Penny had ordered Lisa's murder because she was betraying the gang. Brad added that he would be going to Topeka for the purpose of killing Lisa. He informed Showalter, Pingel, and Hutto of his plan, and they agreed to travel with him to carry out the murder.

On July 20, Brad drove the group in his mother's pickup truck to Lisa's house in Topeka. Lisa was not home, however, and the group returned to Greenleaf. On July 22, Brad told the group they would have to go back to Topeka to kill Lisa. Upon arriving at

Lisa's house, the group had some interaction with Lisa, and they all went together to hang out with Shawn Polinskey, a family friend of Brad. Lisa later returned to her house, but she asked that 17-year-old Jesse Polinskey stay with her that night because she was concerned about her safety.

Early in the morning hours, the Greenleaf group then drove to a Kwik Shop a few blocks away from the house where Lisa and Jesse were sleeping. The group agreed that Hutto and Showalter would walk over to Lisa's house to kill her. Hutto was armed with a knife, and Showalter was armed with a hammer and a knife. They returned to the truck a short time later with blood on their clothing.

Later in the morning of July 23, Jesse's mother unsuccessfully tried to contact Lisa. She went to Lisa's house, where she found the front door locked but a window opened. She entered the house through the window and discovered Lisa's and Jesse's bodies. An autopsy revealed that both had been beaten and stabbed many times and their bodies had been mutilated. Police quickly linked the murders to Brad, and the four members of the group—Brad, Showalter, Pingel, and Hutto—were taken into custody. Clothing was later seized from Hutto by police, and both his DNA and DNA of Lisa and Jesse was recovered from it.

During an interview with police, Hutto initially denied any involvement in the deaths, but he eventually confessed that he had traveled to Topeka with the full understanding that Lisa was to be killed based on Brad's assertion that MS-13 had ordered it. Hutto at first said he did not go to Lisa's residence, but then acknowledged that he approached the residence with Showalter and held the window open for him as he went inside. Hutto subsequently stated that he followed Showalter into the house. Hutto nevertheless insisted that it was Showalter who committed both the murders by himself,

4

but the forensic evidence tended to show that the victims were killed simultaneously, strongly indicating that Hutto actively participated in the murders.

On July 26, 2018, the State filed a complaint charging Hutto with two counts of premeditated first-degree murder, one count of conspiracy to commit premeditated murder, and one count of aggravated burglary. On August 16, 2018, the trial court appointed James Spies to represent him. A preliminary hearing was held on November 19 and 20, 2018. At the preliminary hearing, Spies informed Hutto that a compulsion defense is not available for premeditated murder.

At the conclusion of the preliminary hearing on November 20, the State filed an amended complaint. This instrument charged Hutto with premeditated first-degree murder of Lisa, premeditated first-degree murder of Jesse, alternative counts of felony first-degree murder of Lisa and Jesse, conspiracy to commit first-degree murder, aggravated burglary, attempted premeditated first-degree murder, and possession of methamphetamine.

Hutto pleaded guilty to Count 2 and Count 4 of the amended complaint—felony first-degree murder—and the remaining six counts were dismissed. On May 10, 2019, the court sentenced him to two consecutive hard 25 life sentences.

On May 22, 2019, Hutto filed a pro se motion seeking relief on a wide variety of grounds. He asserted Spies failed to inform him that the State would seek consecutive sentences. He maintained Spies "fear mongered" him into taking the plea by stating that the cons in his case were greater than the pros and he had a one in a million chance of getting less than a 25-year sentence. He argued Spies failed to provide him with the full discovery relating to his case and undermined his right to appeal. He claimed the State engaged in prosecutorial misconduct by making plea offers that were no better than what

he was likely to receive after trial. Finally, he asserted he was denied the right to be personally present in the courtroom during his arraignment and he was denied his statutory speedy trial rights.

The trial court held an extensive hearing on the motion. New counsel was appointed for the hearing, and Spies was called as a witness. The trial court eventually found against Hutto on all the points that he raised in his petition. Hutto took an appeal directly to this court.

ANALYSIS

Of all the allegations that Hutto raised in his petition, only one is advanced on appeal. Hutto argues Spies provided him with ineffective assistance of counsel in the advice he gave leading up to the plea agreement: Spies neglected to inform him that compulsion is a defense to felony murder, and, as a result, he did not enter his guilty plea knowingly and voluntarily.

Appellate courts generally review a district court's decision to deny a postsentencing motion to withdraw a guilty or no contest plea for abuse of discretion. See *State v. Cott*, 311 Kan. 498, 499, 464 P.3d 323 (2020). The movant bears the burden to prove the district court erred in denying the motion. *State v. Fox*, 310 Kan. 939, 943, 453 P.3d 329 (2019).

"To correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw the plea." K.S.A. 2020 Supp. 22-3210(d)(2). Factors a court generally considers in determining whether a defendant has shown the manifest injustice necessary to withdraw a plea after sentencing mirror those considered when reviewing for good cause to support a presentence motion. See *State v.*

6

*Johnson*, 307 Kan. 436, 443, 410 P.3d 913 (2018). These factors include whether the defendant was represented by competent counsel; whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and whether the plea was fairly and understandingly made. See *State v. Fritz*, 299 Kan. 153, 154, 321 P.3d 763 (2014); *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006). Also inherent in manifest injustice is that the context of the plea agreement was obviously unfair or shocking to the conscience. *State v. Adams*, 311 Kan. 569, 575, 465 P.3d 176 (2020).

On appeal, Hutto argues that his counsel was ineffective to the extent of misleading him and preventing him from entering into the plea in a voluntary fashion. His argument boils down to this: after the State amended the charges to include felony first-degree murder as alternative charges, a compulsion defense became legally appropriate, but Spies did not tell him he had the option of going to trial and presenting a compulsion theory to the jury.

Although he made no mention of compulsion in his motion challenging the plea, at the hearing on the motion to withdraw, both Hutto's counsel and counsel for the State probed the issue of the compulsion defense. Hutto asserted that Spies did not explain the defense to him when it became available. Spies was not asked about what he told Hutto about the defense or why he made the decision not to press that defense.

For three reasons, we determine that any failures to inform Hutto about the compulsion defense did not rise to the level of manifest injustice that would require a court to give him leave to withdraw his plea.

7

1. *The issue was not adequately argued to the trial court.*

In his brief to this court, Hutto makes numerous references to the transcript from the preliminary hearing to create a factual basis for his claim that he had a viable compulsion defense. Unfortunately, Hutto did not present the trial court with that same information. He did not cite to any specific portions of the preliminary hearing transcript, and he did not argue from the preliminary hearing testimony that he was actually entitled to the compulsion defense.

Hutto's attorney submitted Proposed Findings of Fact and Conclusions of Law to the trial court. His only proffered statement regarding the compulsion defense was a proposed finding of fact stating, "Months after entering the plea, after having been sentenced, Mr. Hutto was researching his case at the law library in prison and discovered a possible defense. . . . Mr. Spies had previously told Mr. Hutto that a compulsion defense was not available in homicide cases, but research suggested otherwise."

This does not create a factual basis for the trial court to conclude that the compulsion defense was indeed available to Hutto under the facts of his case. It merely states that a compulsion defense may be available in some homicide cases. For that matter, alibi defenses and self-defense defenses are also available in some homicide cases, but that does not mean they were available for Hutto. He did not provide the trial court with the grounds to find manifest injustice that he now asks this court to find as a matter of law.

This court does not make factual findings; it reviews those made by district courts. *State v. Reed*, 300 Kan. 494, 513, 332 P.3d 172 (2014). In the present case, Hutto did not submit a basis for the trial court to make the findings that he wants this court to make:

8

that he had a viable compulsion defense. He also did not submit that theory to the trial court in his proposed findings and conclusions.

The trial court did not mention the compulsion defense issue in its lengthy order denying Hutto his requested relief. This may be understood as an indication that Hutto did not preserve the issue to the trial court in such a way as to allow a decision on it, or it may be understood as a neglected topic that Hutto did not attempt to remedy by asking for more complete and specific findings. See, e.g., *Reed*, 300 Kan. at 514 (failure to object to insufficient findings at hearing or move for findings under Supreme Court Rule 165 [2021 Kan. S. Ct. R. 230] constitutes barrier to appellate review). In either event, Hutto failed to make a record to the trial court or this court that would allow us to find reversable error.

2. *The evidence would not support a compulsion defense.*

K.S.A. 2020 Supp. 21-5206(a) sets out the requirements for asserting a compulsion defense:

> "A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which such person performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if such person reasonably believes that death or great bodily harm will be inflicted upon such person or upon such person's spouse, parent, child, brother or sister if such person does not perform such conduct."

Hutto correctly notes that, when the State amended its complaint to include felony murder charges, a compulsion defense became legally appropriate. In *State v. Hunter*, 241 Kan. 629, Syl. ¶ 6, 740 P.2d 559 (1987), this court held that compulsion may be used as a defense to felony murder if it is a defense to the underlying felony. Hutto's

9

underlying felony was aggravated burglary, so he would have to argue that he was acting under compulsion when he entered Lisa's house.

Even though the compulsion defense is available in cases of felony murder, it remains a limited defense. The coercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The doctrine of coercion or duress cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm. Furthermore, the compulsion must be continuous and there must be no reasonable opportunity to escape the compulsion without committing the crime. *State v. Dunn*, 243 Kan. 414, 421, 758 P.2d 718 (1988).

A threat of future injury is not enough to invoke a compulsion defense. *State v. Matson*, 260 Kan. 366, 385, 921 P.2d 790 (1996). If the intimidation is not continuous and if there is a reasonable opportunity to escape, the defendant cannot claim he was compelled to be present when the crime was committed. *State v. Scott*, 250 Kan. 350, 359, 827 P.2d 733 (1992).

In order to receive a requested instruction a party must demonstrate that the instruction is both legally and factually appropriate. See *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018). Here, a compulsion defense may have been legally appropriate to the charges of felony murder, but it was not appropriate under the facts developed in the record below.

In his appellate brief, Hutto cites at length to testimony from the preliminary hearing tending to show that Brad Sportsman was a highly manipulative and controlling person. He used methamphetamine, sexual relationships, beatings, contrived gang

10

affiliations, and simulations of violent behavior to obtain what he wanted from the group of younger people around him. Hutto said he was afraid Brad would kill him if he did not do what he wanted.

At the hearing on his motion to withdraw his plea, Hutto testified that he was afraid Brad would kill him or his family if he refused to go along with the scheme to murder Lisa and Jesse. He testified:

> "I told the detectives this, and Mr. Sportsman told me that if—I didn't go with— if I wouldn't—if I didn't get dropped off with, like, I dropped off with Richard Showalter, that he would—he would kill me. The only way out of all this was dead. And you know, I—I was—I felt I feared for my life, and I had informed the police of this multiple times. . . .
>
> ". . . I felt that my family would be—would be in danger as well, because my entire time that I had—the short amount of time that I had known Bradley Sportsman, there was lots of talk of, you know, how he—how he did stuff to people's family that didn't do what he want, that didn't, you know, basically, kind of went against the grain. You know, I was fear for my family's life, for my life, and there were some other significant other's life as well, if I didn't do what he wanted me to do."

There is a difference between controlling, and even threatening, behavior and creating a situation of legal compulsion. Although Hutto said he was afraid of Brad and Brad threatened to kill him if he did not leave the truck with Showalter, he did not say that anyone told him he would or anyone close to him would be killed if he refused to commit the crimes. None of the proffered evidence states that Hutto was exposed to a present, continuing, and imminent threat if he did not prepare to participate in killing Lisa and Jesse and that he had no opportunity to escape.

To the contrary, the evidence shows that the murderous group drove to Topeka once for the purpose of killing Lisa and then returned to Greenleaf for a couple of days

11

before again going to Topeka to carry out the crime. Hutto testified at the motion hearing that he had knowledge of Brad's plan "for at least two days" before they went into Lisa's house. Hutto makes no showing that he was unable to escape or go to law enforcement for protection. He and Showalter walked to Lisa's house at night, and Brad did not accompany them. Hutto held a window open for Showalter to enter the house. Hutto proffers no evidence that he was unable to escape into the night while his cohort was in the house armed with a knife and a hammer. Hutto essentially argues that, because he was afraid of Brad, he was compelled to take the lives of two other people. Hutto may have been manipulated into committing murder, but he was not acting under statutory compulsion when he committed the murders.

Hutto's claim on appeal that he was denied the opportunity to present a compulsion defense fails in light of the most likely scenario if he had elected to go to trial—he would not have received a compulsion defense instruction, because such an instruction would not have been factually appropriate. Given the absence of any record evidence supporting a compulsion defense, Hutto fails to establish manifest injustice necessary to withdraw his plea.

3. *Failure to inform Hutto regarding a compulsion defense was not per se deficient performance by trial counsel resulting in manifest injustice.*

In pursuing a postsentence motion to withdraw a plea, "[t]he defendant must show that counsel's performance fell below the standard of reasonableness and that there was a reasonable probability that, but for counsel's errors, the defendant would not have entered the plea and would have insisted on going to trial." *State v. Bricker*, 292 Kan. 239, Syl. ¶ 5, 252 P.3d 118 (2011).

Here, Hutto makes no showing that Spies' performance fell below the standard of reasonableness.

12

As explained above, compulsion was *not* a defense under the facts of the case. It cannot be the law that failing to inform one's client of every possible defense to a murder charge, no matter how specious the defense might be, constitutes legal representation so far below the acceptable standard that it would be manifest injustice not to allow the client to withdraw a plea.

A party seeking to withdraw a plea has the burden to show that the potential consequence of which his attorney did not advise him was "more than a remote possibility." See *State v. Schaefer*, 305 Kan. 581, 591, 385 P.3d 918 (2016).

Courts engage in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strategic choices that counsel made after thoroughly investigating the law and facts relevant to plausible options are virtually unchallengeable. And strategic choices made after an incomplete investigation can fall within the wide range of reasonable professional assistance if the decision to limit the investigation is supported by reasonable professional judgment. *Bricker*, 292 Kan. at 252.

Because Hutto did not inquire of Spies why he did not inform him that he could pursue a compulsion defense to felony murder, neither the trial court nor this court can know what Spies' motivation was. Spies testified and agreed that the plea that Hutto accepted was, "[u]nder the circumstances," "the best possible outcome for him." This was because the evidence was so strong against him, but the plea gave him the opportunity for a less-than-50-year sentence.

Spies did not ignore the course of controlling and manipulative conduct by Brad Sportsman. At sentencing, Spies attempted to convince the court that Sportsman had

13

exerted undue influence on Hutto to make him commit the crimes. He did this in order to mitigate Hutto's culpability and convince the court to impose a lesser punishment.

Hutto did not create a record demonstrating that Spies' representation was deficient in any way, and certainly not in failing to inform Hutto that he had a potential viable defense.

## CONCLUSION

For the three reasons set out above, Hutto failed to prove manifest injustice in the circumstances of entering his guilty plea, and the trial court did not abuse its discretion in denying his motion for relief.

The judgment of the trial court is affirmed.

WILSON, J., not participating.

14