IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 128,224

STATE OF KANSAS,
*Appellee*,

v.

WESLEY RAYTON,
*Appellant*.

SYLLABUS BY THE COURT

1.

A defendant who pleads guilty and moves to withdraw the plea before sentencing under K.S.A. 22-3210(d)(1) can directly appeal the district court's denial of that motion.

2.

Appellate courts review a district court's decision on a presentence motion to withdraw plea for an abuse of discretion, and the defendant bears the burden to prove the court abused its discretion in denying the motion.

3.

Before sentencing, a defendant may withdraw his or her plea for good cause shown. When determining whether a defendant has demonstrated good cause, district courts generally look to the following three factors under *State v. Edgar*, 281 Kan. 30, 127 P.3d 986 (2006): (1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made.

1

4.

The applicable legal standard when considering the competence of counsel for purposes of withdrawing a plea under the first *Edgar* factor is well established. When a defendant moves to withdraw a plea after sentencing, a trial court must use the Sixth Amendment constitutional ineffective assistance standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to consider whether the defendant was represented by competent counsel. But when the same motion is made before sentencing, a lower standard of lackluster advocacy may constitute good cause to support the presentence withdrawal of a plea.

5.

When a presentence motion to withdraw a plea is based on a mistake or misstatement, courts may consider the circumstances surrounding the misinformation to the extent they bear on the *Edgar* factors.

Appeal from Shawnee District Court; JESSICA L. HEINEN, judge. Submitted without oral argument December 17, 2025. Opinion filed February 13, 2026. Affirmed.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Jodi Litfin*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.:  As part of a plea agreement, Wesley Rayton entered a guilty plea to first-degree felony murder, an off-grid person felony, for the shooting death of Michael Comp. In exchange, the State dismissed all remaining charges against Rayton in this case and in another pending criminal case. Before sentencing, Rayton moved to withdraw his plea. After an evidentiary hearing, the district court denied the motion for lack of good

2

cause and sentenced Rayton to life without the possibility of parole for 25 years. Rayton directly appeals the denial of his motion to withdraw the plea. For the reasons below, we conclude the district court did not abuse its discretion in denying Rayton's motion and thus affirm the district court's decision.

FACTUAL AND PROCEDURAL BACKGROUND

Just after noon on January 31, 2023, law enforcement was dispatched to a residential neighborhood in southeast Topeka to investigate a reported shooting and related vehicle accident. Eyewitnesses told police the suspected shooter fled the scene in a "beat up" green Ford Explorer with a black driver's side door. A responding officer observed a vehicle matching this description in the area and initiated a traffic stop. The driver pulled over and immediately jumped out, got down on his knees, and identified himself. Police later confirmed the suspect's identity as Wesley Tyrone Rayton Sr.

During the stop, Rayton told the approaching officer the "gun is right there in the car" and said he "didn't mean to." The officer found a Ruger SR9 (9mm) handgun inside the vehicle by the center console on the passenger side and a loaded magazine in the driver's seat. The firearm serial number matched one reported stolen in 2019.

At the scene of the shooting, other officers located a white Chevrolet tow truck that had been driven through a mailbox and came to rest in the adjacent yard. Inside the truck, a deceased male, later identified as Michael Comp, was slumped over in the driver's seat. The truck appeared to have been struck by bullets at least three times, with two bullets hitting the bed of the truck and one entering the back window and going through the driver's seat, striking Comp in the back. Six spent shell casings were located in the nearby street.

According to a witness at the scene, Comp was dropping off a vehicle at the witness' residence when Rayton approached on foot with a handgun and started shooting at Comp. Comp jumped into the tow truck and started driving away as Rayton continued to shoot. The tow truck ultimately crashed into a yard. Another witness reported that after the crash, he observed the Explorer pulling up to the scene. That witness saw the driver get out and look inside the tow truck before getting back into the Explorer and speeding off.

Police contacted the owner of the tow truck company, who said he and Comp had recently been buying scrap vehicles from a man named "Wes." The owner described an incident in which Comp and Wes engaged in a heated argument over accusations of a stolen vehicle, during which Wes allegedly discharged a firearm into the air.

At the time of his arrest, Rayton admitted to shooting Comp but told police he was firing into the air and did not intend to strike him. Rayton also told police that "they" had stolen his truck. During a post-*Miranda* interview, Rayton maintained he did not intend to hurt Comp and was only trying to scare him, and by extension the tow truck owner, into returning a stolen vehicle.

Home security footage of the street during the incident reportedly confirmed the eyewitness accounts. In the reported footage, Comp arrives at a house to unload a vehicle and then stands on the passenger side of the tow truck. Rayton soon approaches Comp, pointing a handgun at him. Comp ducks around the front of the tow truck, hops into the driver's seat, and begins to drive off as Rayton shoots at the truck several times. The tow truck drives for a short distance before crashing into a yard.

The autopsy report revealed Comp died from a single gunshot wound to his back; the bullet traveled through his right lung, exited his chest, and fell to the floorboard of the tow truck. The bullet casings recovered at the scene matched the caliber (9mm) of the

4

handgun found in Rayton's vehicle during his arrest.

The State charged Rayton with first-degree felony murder, criminal discharge of a firearm at an occupied vehicle, theft of a firearm, and aggravated assault with a deadly weapon. Before the preliminary hearing, the State filed an amended complaint to add a first-degree premeditated murder charge. At the preliminary hearing, the district court bound Rayton over on all charges.

Soon after his arrest, the district court appointed KiAnn Caprice to represent Rayton. She served as his counsel from the preliminary hearing in spring 2023 through his entry of a guilty plea in February 2024, withdrawing shortly after Rayton asked to withdraw his guilty plea in May 2024.

On June 30, 2023, Caprice met with Rayton at the jail where they discussed aspects of his case, including a potential plea. Afterward, Caprice emailed the prosecutor with an offer that Rayton would plead guilty to a "charge to be determined" and serve 10 years. In an email response to Caprice on July 10, 2023, the State rejected that offer but provided a counteroffer: Rayton would plead guilty to felony murder in exchange for dismissal of all other charges and a "sentence of life in prison without the possibility of parole until 25 years have been served." Rayton did not accept the offer at that time.

A pretrial hearing was held on December 1, 2023. At the hearing, the district court acknowledged plea negotiations between the parties, noting Rayton's final offer was 10 years and the State's final offer was felony murder. The parties confirmed no plea agreement had been reached, and a trial date was set for February 2024. On February 9, 2024, Caprice and Rayton met to prepare for trial and again discussed the State's plea offer, which Rayton again rejected.

5

The parties appeared for trial on February 12, 2024. Before jury selection, Caprice provided Rayton with paper and pen so they could trade notes. During voir dire, they both expressed concerns about the jury panel and a potentially unfavorable outcome at trial. Rayton wrote "from the looks of the jury I'm already fried." Caprice responded "I would 100% agree. I'm sorry but that's the truth." She also said "I'm thinking realistically and w[ith] these people I don't feel comfortable with at all. I mean I haven't seen a jury panel this bad in a long time!" Rayton replied, "[A] lot of police involvement." Caprice then suggested Rayton "[s]trongly" "reconsider the [State's] plea offer." He responded, "I'll consider the plea of 15 to life or [c]an you try to get me the best deal you can get[?]" Caprice and Rayton exchanged additional written comments about sentencing procedures, the effect of his criminal history on sentencing, and the proposed plea agreement.

Before the jury was sworn in, the parties told the court that plea discussions were back underway and put several items on the record. The State reiterated its original offer that Rayton plead guilty to felony murder in exchange for dismissal of all remaining counts in this case. The State also noted Rayton had other charges against him in a pending criminal case, 2022-CR-2410. Caprice then countered, requesting that any sentence in the other criminal case run concurrent to the controlling sentence for felony murder. Caprice said she had given Rayton a copy of the written plea offer and the sentencing guidelines, circling what she believed was the relevant sentencing range based on his criminal history. She then asked the court to explain the maximum sentence Rayton could face if convicted at trial, which the court did.

At Caprice's request, the court allowed Rayton to consider the plea agreement overnight and agreed to give him time the next day to meet briefly with his family before making a final decision at the plea hearing. That night, the State sent Caprice an updated counteroffer agreeing to dismiss all charges in the pending case, 22-CR-2410. Caprice also learned that night that Rayton's criminal history score was likely "D."

When the parties reconvened the next day, they updated the court on the status of the plea negotiations: the State's final offer was for Rayton to plead guilty to felony murder and, in exchange, the State would dismiss all other charges in this case and his other pending criminal case, 2022-CR-2410. Caprice relayed her understanding that, based on Rayton's expected criminal history score, he would receive a controlling sentence of "25 to life" if he pled guilty to felony murder, which meant there was "no guarantee that he would be paroled at 25 [years], but he'd have an opportunity" at that point to seek parole. Caprice asked the court to correct any inaccuracy in her assessment so Rayton would have "correct and full knowledge" when considering the plea.

The court agreed with Caprice's description of Rayton's controlling sentence if he accepted the plea and then provided a more detailed explanation about the relevant sentencing guidelines. The court said the governing statute imposes a life sentence for this type of crime by the following language: "You shall be sentenced to imprisonment for life, and shall not be eligible for probation, or suspension, modification, or reduction of sentence." The court then explained the statutory requirement for a mandatory minimum term of imprisonment in laymen's terms:

> "So it's 25 years. You should—shall not be eligible for parole prior to serving the 25 years imprisonment, and you cannot get good time credit for that. So you would have to serve 25 years for felony—if you pled to felony murder before there could be any consideration for parole."

When asked by the court if he understood, Rayton said, "Yes, ma'am."

The court next laid out the potential sentences Rayton could face if found guilty on the charges at trial. The court started with the most serious offense, first-degree premeditated murder, which requires a controlling sentence of at least 50 years before eligibility for parole. The court explained Rayton's sentence for this crime could be even

longer depending on his final criminal history score, which would not be known until sentencing. As an example, the court described the "worst-case scenario": if Rayton's criminal history score was identified as "A," then he could face up to 653 months (over 54 years) of imprisonment before being eligible for parole. In the course of this discussion, the court asked Rayton if he understood this information three separate times, and he responded, "Yes, ma'am," each time.

The court then went through each additional count one-by-one and conveyed the possible sentencing range for each, asking whether Rayton understood the information before moving on to the next; each time, he replied, "Yes, ma'am." Lastly, the court stated it had discretion to order the sentences to run concurrent or consecutive and asked if Rayton understood. He again responded, "Yes, ma'am."

The State then asked that the total timeframe for plea negotiations be included on the record and asserted that Rayton had roughly seven months to consider this plea, which was substantively unchanged from the State's original offer. Caprice, in turn, reiterated Rayton's desire to discuss the plea agreement with his family members who were present in the courthouse and asked if the court would permit that conversation to take place with appropriate safety precautions. The court consented, allowing Rayton approximately 15 minutes to meet with family members in the courtroom during a brief recess.

Back on the record, the court asked whether Rayton intended to accept the plea deal, and Caprice confirmed he did. The court then reviewed the written plea agreement on the record, acknowledging the following express terms:

- Defendant will plead guilty to Count 1, first-degree felony murder.
- The State will dismiss all remaining counts.
- Defendant must register as a violent offender for 15 years.

8

- Case No. 22-CR-2410 will be dismissed.
- Sentencing will be open for each side to argue any lawful sentence.

The court asked whether the preceding description matched the parties' understanding of the agreement, and both agreed it did.

Next, and in greater depth than before, the court explained to Rayton the consequences of accepting the plea. In particular, the court highlighted that Rayton would be required to serve a life sentence and that his mandatory term of imprisonment before being eligible for parole would be determined by his criminal history score at sentencing and could vary significantly. Rayton was provided a paper copy of the sentencing grid, which the court referenced as it discussed how his criminal history score would affect his final sentence. In the course of this discussion, the district court asked Rayton if he understood the information being presented at least 10 times, and Rayton responded each time that he did. When the court asked if he had any questions regarding "the amount of time for the plea to felony murder," Rayton answered, "No."

The court then asked Rayton a series of questions to verify that he was entering the plea knowingly, voluntarily, and intelligently. In response to the court's initial inquiries, Rayton confirmed he understood the constitutional rights he was waiving by pleading guilty, agreed the State could produce enough evidence to support a felony-murder conviction, and confirmed he was satisfied with the legal representation he had received.

When the court asked if he suffered from any mental condition that would interfere with or impair his ability to make a voluntary plea, Rayton stated he took mental health medication to slow down his mind and help him think more clearly. He then confirmed he was thinking clearly. Caprice informed the court Rayton reviewed discovery and that they had discussed multiple defenses in preparation for trial. Caprice

9

also told the court that Rayton had read the plea agreement and asked good questions about it before the hearing. Based on these interactions, Caprice said she had no concerns about Rayton's medication affecting his competency in these proceedings. Along similar lines, the court verified with Rayton that he had not consumed alcohol or taken any mind-altering drugs within the last 48 hours.

In the final phase of questioning, the court asked Rayton whether any undue influence had been exerted on him to elicit a plea, asking, "Has anyone threatened you, coerced you, or promised you anything to get you to enter a plea here today?" Rayton responded, "No." When asked if he was satisfied with the plea agreement reached on his behalf, he answered, "Yeah." Lastly, the court asked how Rayton wished to plead to Count 1 for first-degree felony murder; he responded, "Guilty." After granting the State's motion to dismiss all other charges in this case and the other pending case, the court advised Rayton of his duty to register as a violent offender. The court scheduled the sentencing hearing for June 2024.

In May 2024, before sentencing, Rayton sent a signed letter to the district court asking to withdraw his plea:

> "I would like to withdraw my plea deal, I no longer wish to accept an open sentence plea or any plea for that matter, I was only given 24 hours to think on it. I was advised by my attorney this would be of my best interest but its not. Due to my lack of understanding I'm not sure what an open plea means.

> "At the time of accepting this plea I was under the influence of mental health meds, so I can't say for sure what was being said or done. The State claims that this deal had been on the table for 7 mos well I never informed by my attorney until the day before my trial started. I would like to go trial like I always wanted, but being under pressure and scared all at the same time I accepted a plea I don't even understand. I would respectfully ask you to withdraw my plea deal."

The district court treated Rayton's letter as a pro se motion to withdraw a guilty plea prior to sentencing. Caprice withdrew as his counsel, and the district court appointed another attorney to represent him for the rest of the proceedings.

On August 29, 2024, the district court held an evidentiary hearing on Rayton's motion to withdraw plea. The hearing was continued to September 24, 2024, to allow counsel to review transcripts before making final arguments to the court. After considering testimony from various witnesses (including Rayton and Caprice), additional evidence, and the parties' arguments, the court determined Rayton failed to show good cause to withdraw his guilty plea and thus denied his motion.

ANALYSIS

The sole question in this case is whether the district court abused its discretion by denying Rayton's motion to withdraw his guilty plea.

*Preservation and jurisdiction*

A defendant's statutory right to file a motion to withdraw a plea under K.S.A. 22-3210(d) implies a corresponding right to appeal the denial of that motion. *State v. McDaniel*, 255 Kan. 756, 758-59, 877 P.2d 961 (1994) (holding K.S.A. 22-3602[a] does not preclude a direct appeal from a denial of a motion to withdraw plea); e.g., *State v. Showalter*, 319 Kan. 147, 172, 553 P.3d 276 (2024) (recognizing right to direct appeal from denial of postsentence motion to withdraw plea). Here, Rayton moved to withdraw his plea before sentencing and cited grounds for withdrawal. The court held an evidentiary hearing and denied the motion. Rayton appeals from that judgment. Thus, this issue is properly before this court on direct appeal. See K.S.A. 22-3601(b)(4) (direct appeal to Supreme Court from district court's final judgment when defendant convicted of off-grid crime); Kansas Supreme Court Rule 6.02 (2025 Kan. S. Ct. R. at 35).

11

*Standard of review*

Appellate courts review a district court's decision on a presentence motion to withdraw plea for an abuse of discretion, and the defendant bears the burden to prove the court abused its discretion in denying the motion. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023). An abuse of discretion occurs if the judicial action is (1) arbitrary, fanciful, or unreasonable, i.e., no reasonable person would have taken the view adopted by the court; (2) based on an error of law, i.e., guided by an erroneous legal conclusion; or (3) based on an error of fact, i.e., substantial competent evidence does not support an underlying factual finding. 317 Kan. at 63. Appellate courts do not reweigh evidence or assess witness credibility, and they give deference to a district court's factual findings if supported by substantial competent evidence, which is evidence that a reasonable person could accept as adequate to support a conclusion. *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012); *State v. Anderson*, 291 Kan. 849, 855, 249 P.3d 425 (2011).

*Legal framework*

The standard governing a motion to withdraw a plea varies with timing. Before sentencing, a defendant must show good cause; after sentencing, withdrawal is permitted only to correct manifest injustice. K.S.A. 22-3210(d)(1), (2). In this case, the good-cause-shown standard applies because Rayton filed his motion before he was sentenced. In conducting a good-cause analysis, courts consider the following nonexclusive factors, known as the *Edgar* factors—whether (1) the defendant was represented by competent counsel; (2) the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) the plea was freely, fairly, and understandingly made. *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006); *State v. Hill*, 247 Kan. 377, 385, 799 P.2d 997 (1990) (discussing adoption of ABA standards for plea negotiations in *State v. Byrd*, 203 Kan. 45, 50-52, 453 P.2d 22 [1969]). All three factors need not apply in defendant's favor, and any other relevant factors may support a good-cause finding in a particular case. *Bilbrey*,

12

317 Kan. at 62-63; *State v. Aguilar*, 290 Kan. 506, 513, 231 P.3d 563 (2010).

On appeal, Rayton asserts all three *Edgar* factors weigh in his favor and thus support a good-cause finding. We address each factor in turn.

1. *Whether Rayton was represented by competent counsel*

Under the first *Edgar* factor, a court considers whether the defendant was represented by competent counsel. When a defendant seeks to withdraw a plea *after* sentencing—where relief is available only to correct manifest injustice—claims about counsel's performance are evaluated under the constitutional ineffective-assistance standard set out in *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which requires a defendant to show both deficient performance and resulting prejudice. But that heightened standard does not apply to a *presentence* motion to withdraw a plea like the one Rayton filed here. Under K.S.A. 22-3210(d)(1), "lackluster advocacy" may be sufficient to satisfy the first *Edgar* factor. See *State v. Herring*, 312 Kan. 192, 198, 474 P.3d 285 (2020) (citing *Aguilar*, 290 Kan. at 513).

Notably, the question on appeal is not whether this court would independently characterize counsel's performance as lackluster. Rather, the inquiry is whether the district court abused its discretion in concluding that counsel's representation was not lackluster. *Herring*, 312 Kan. at 201-02.

Rayton's claim under this factor centers on a handwritten note exchange that occurred during voir dire, after both Rayton and his counsel expressed concern about the composition of the jury panel. In that exchange, counsel stated she believed Rayton's criminal history score was "B," suggested that such a score would allow her to "ask for less time," and explained that an open plea meant the parties could "ask for what we want." Rayton argues these statements misstated the law governing felony-murder

13

sentencing and demonstrate lackluster advocacy at a critical stage of the proceedings.

In addressing the first *Edgar* factor, the district court properly applied the "lackluster advocacy" standard applicable to a presentence motion to withdraw a plea. The court expressly recognized that defense counsel initially discussed Rayton's potential sentencing exposure based on an assumed criminal history score of B. The court found, however, that this assumption was corrected before the plea was entered. As the court explained, counsel advised Rayton the day before the plea that his criminal history was likely D and discussed with him the sentencing consequences associated with that score. The plea agreement was revised to reflect criminal history D, and the court emphasized that it independently advised Rayton—before accepting the plea—that the court, not counsel, would determine his final criminal history at sentencing.

The district court found that counsel reviewed discovery with Rayton, discussed potential defenses, engaged in plea negotiations over an extended period of months, and advised him of sentencing consequences both before and after confirming his criminal history score. The court concluded that counsel's advice regarding criminal history, although initially based on an assumption, was corrected before the plea was entered and supplemented by the court's own advisements.

The district court also found that, at the plea hearing, it thoroughly explained the sentencing consequences of a felony-murder conviction, including the mandatory life sentence, parole eligibility after 25 years, the absence of probation or departure, and the possibility that criminal history could affect sentencing outcomes. The court noted that Rayton affirmatively stated he understood those consequences, indicated he had read and initialed each provision of the plea agreement, and confirmed he had no questions before entering the plea.

14

In addressing Rayton's claim that he did not understand the plea or felt pressured to accept it, the district court relied on the plea transcript, the plea agreement, and Rayton's recorded jail calls. The court found those materials showed Rayton understood the sentencing consequences, weighed his options between trial and plea, and decided to plead guilty to avoid the risk of a longer sentence. The court expressly found that Rayton's decision reflected a change of mind rather than confusion, coercion, or misinformation.

Based on these findings, the district court concluded that counsel's overall performance did not constitute "lackluster advocacy" for purposes of the first *Edgar* factor. Although reasonable jurists might weigh the significance of counsel's voir dire misstatements differently, the abuse of discretion standard does not permit this court to substitute its judgment for that of the district court. Given its factual findings, its consideration of the totality of counsel's representation, and its reliance on a thorough plea colloquy to ensure Rayton's understanding, the district court's conclusion is one a reasonable jurist could reach.

Accordingly, the district court did not abuse its discretion in concluding that the first *Edgar* factor does not favor withdrawal of Rayton's plea.

2. *Whether Rayton was misled, coerced, mistreated, or unfairly taken advantage of*

Under the second *Edgar* factor, courts evaluate whether a defendant was misled, coerced, mistreated, or unfairly taken advantage of in the context of a plea. *Edgar*, 281 Kan. at 36. Such a finding may render a plea involuntary and thus void. See *Morrow v. State*, 219 Kan. 442, 445, 548 P.2d 727 (1976) (A plea induced by promises or threats is deprived of its voluntary character and therefore void.).

During the plea colloquy, the district court verified that Rayton's plea was voluntary by asking, "Has anyone threatened you, coerced you, or promised you anything to get you to enter a plea here today?" Rayton responded, "No."

In his pro se motion to withdraw plea, Rayton claimed he had only 24 hours to consider the plea and was under pressure and scared. The district court rejected Rayton's claim, relying on the record of the plea negotiations and the evidence presented during the hearing on the motion. With respect to the timeline of the plea offer, the court found the record conflicted with Rayton's account and instead showed: the plea negotiations started seven months earlier in June 2023, the substance of the State's offer had not changed in that time, and the offer remained on the table for Rayton to accept or decline until trial. Thus, the court found the timing of the plea offer did not provide good cause to withdraw the plea.

As to the pressure and fear Rayton felt during the plea, the district court acknowledged these emotions are likely always present "when deciding to take a plea of this magnitude." Specific to Rayton's plea, the district court recalled Rayton's testimony at the motion to withdraw hearing when he said that he felt pressure from the plea itself and fear about the length of the sentence. The district court noted there was no evidence presented at the hearing to show an "outside force" had induced Rayton to take the plea or to show he was otherwise misled or taken advantage of. To the contrary, Rayton testified that he had considered the consequences of accepting the plea versus going to trial and potentially being convicted. Because the evidence showed Rayton weighed his options and took the plea voluntarily, the district court found Rayton had failed to show good cause under this factor to grant his motion to withdraw plea.

On appeal, Rayton now claims he was misled, coerced, and unfairly taken advantage of by his attorney, suggesting her undue influence led him to accept a guilty plea that was not in his best interests. He notes that it was Caprice who suggested he

16

reconsider the State's plea offer after he expressed concerns about potential jurors during voir dire. Rayton describes Caprice's legal advice during that exchange as misleading, especially in light of his desire to avoid a life sentence. He also characterizes her comments—agreeing "100%" that he was "already fried" and that she had not "seen a jury panel this bad in a long time"—as an attempt to coerce him into accepting the State's plea offer.

On the surface, Rayton's arguments on appeal do not seem preserved. This court's task is to review the district court's factual findings and legal conclusion that Rayton was not misled, coerced, mistreated, or unfairly taken advantage of for an abuse of discretion—not to perform the good-cause analysis anew. That said, a connection can be made between these fresh claims and the district court's conclusion that Rayton did not experience *external* pressure to enter the plea, even though he does not explicitly connect these dots. Thus, we will address these assertions as reframed.

Rayton argues that Caprice misled him by providing incorrect sentencing information and "dangling the possibility of being able to ask for any possible sentence." As discussed above, Caprice did give Rayton inaccurate information during voir dire regarding the effect of his criminal history score on sentencing and the scope of the plea agreement's open-sentencing provision. Under these circumstances, the significance of the misinformation depends on whether it affected the *Edgar* factors. See *State v. Schow*, 287 Kan. 529, 544-46, 197 P.3d 825 (2008) (explaining that when a presentence motion to withdraw a plea is based on a mistake about criminal history, courts may consider the circumstances surrounding the misinformation to the extent they bear on the *Edgar* factors).

In considering the circumstances surrounding the misinformation provided by Caprice to Rayton during voir dire, there is no evidence that the misinformation had any bearing on the *Edgar* factors, including whether the defendant was misled, unfairly taken

17

advantage of, or failed to understand the consequences of the plea. Here, the record shows the district court fully explained Rayton's sentence based upon the statutory requirement for felony murder, his anticipated criminal history score, and the plea agreement—thus correcting or clarifying any misinformation prior to Rayton considering the final plea agreement and entering his plea.

In sum, Rayton's claim that he was misled, unfairly taken advantage of, or failed to understand the consequences of the plea lacks support. Thus, the district court did not abuse its discretion in determining this factor weighs against granting his motion.

### 3. *Whether the plea was fairly and understandingly made*

The third and final *Edgar* factor requires a court to determine whether the plea was fairly and understandingly made. 281 Kan. at 36-37. Rayton does not contend that the district court failed to comply with statutory or constitutional requirements for accepting a guilty plea. See K.S.A. 22-3210; *State v. Moses*, 280 Kan. 939, 945-46, 127 P.3d 330 (2006). Instead, he argues that his plea was not understandingly made because (1) his mental health issues and prescribed medications impaired his comprehension at the time of the plea, and (2) his jail phone calls demonstrate that he misunderstood the sentencing consequences of the plea agreement.

#### a. *Mental health and medication*

Rayton asserts his mental health issues were "more serious than the parties described below" because he was taking Olanzapine and Aripiprazole at the time of the plea. In support, he relies on general descriptions of those medications drawn from sources outside the record. But no evidence was presented to the district court establishing what conditions the medications were prescribed to treat or that they impaired Rayton's ability to understand the proceedings. "This court does not make

factual findings; it reviews those made by district courts." *State v. Hutto*, 313 Kan. 741, 746, 490 P.3d 43 (2021).

The record from the plea hearing reflects that the district court directly questioned Rayton about his mental health and medications. Rayton said that his medication helped him think more clearly, that he felt he was thinking clearly at the time of the plea, and that there was nothing he did not understand. Defense counsel also made a contemporaneous record that Rayton had reviewed the plea agreement, asked appropriate questions, and had no difficulty communicating or understanding the proceedings. The district court later credited this testimony and its own observations in finding that Rayton's mental health and medications did not impair his understanding.

b. *Jail phone calls and alleged misunderstanding*

Rayton also relies on statements made during jail phone calls to argue that he misunderstood the sentencing consequences of the plea agreement. In particular, he relies on his references to incorrect potential sentences and his belief that "open sentencing" allowed the court to impose any sentence it wished.

The district court heard this evidence and the parties' related arguments at the motion and sentencing hearings. Still, the court found Rayton directly conveyed to the court during the plea hearing that he fully understood the nature and consequences of entering a plea. Further, the court found Rayton testified at the motions hearing that he had weighed all of his options, including by comparing the potential sentence of 50 years before seeing a parole board if convicted of first-degree premeditated murder versus 25 years before being eligible for parole if pleading guilty to felony murder pursuant to the plea agreement.

On appeal, this court does not reweigh conflicting evidence or reassess witness credibility. *Anderson*, 291 Kan. at 855. The district court was in the best position to evaluate Rayton's statements in context, observe his demeanor, and assess whether any confusion reflected a lack of understanding sufficient to constitute good cause to withdraw the plea. See *State v. Macias-Medina*, 293 Kan. 833, 839, 268 P.3d 1201 (2012). Substantial competent evidence supports the district court's conclusion that Rayton understood the essential sentencing consequences of the plea at the time it was entered. Thus, the district court did not abuse its discretion in determining that Rayton failed to show his plea was not fairly and understandingly made.

4. *Conclusion*

In sum, the district court did not abuse its discretion in concluding that Rayton failed to establish good cause to withdraw his plea before sentencing. Specifically, the district court's conclusion is grounded in the applicable law and is supported by substantial competent evidence from which a reasonable judge could conclude that Rayton was represented by counsel whose performance was not lackluster; that he was not misled, coerced, or unfairly taken advantage of; and that he entered the plea knowingly, fairly, and with an understanding of its consequences.

The judgment of the district court is affirmed.

LUCKERT, J., not participating.